## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| COOKWARE SUSTAINABILITY ALLIANCE, | Case No. 0:25-cv-00041 (JRT/DTS) |
| Plaintiff, | |
| v. | |
| KATRINA KESSLER, in her official capacity as Commissioner of the MINNESOTA POLLUTION CONTROL AGENCY (MPCA), | **ORAL ARGUMENT REQUESTED** |
| Defendant, | |

**Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction Enjoining Enforcement of Certain Provisions of Amara's Law**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND .............................................................................. 3

      A.    Minnesota Passes Amara's Law ................................................. 3

      B.    Cookware Sustainability Alliance ............................................. 4

      C.    The Nonstick Cookware Market ............................................... 5

            i.     Available Cookware Surfaces ....................................... 5

            ii.    The Cookware Market........................................................ 9

            iii.   Fluoropolymer Nonstick Products are Manufactured Exclusively Outside Minnesota. ............................... 9

            D.    The Targeted Products Poses No Appreciable Risk to Minnesotans…………………………………………………….. 10

      E.    Procedural History........................................................................ 13

ARGUMENT....................................................................................................... 13

    I.    Legal Standard........................................................................... 13

    II.   An Injunction Preserving the Status Quo is an Appropriate Exercise of this Court's Equitable Authority. .................................................. 15

      A.    Plaintiff's Claims are Likely to Succeed........................................ 15

      B.    Plaintiff Will Suffer Irreparable Harm if Enforcement of the Statute is Not Stayed During the Pendency of this Action. ............ 28

      C.    The Interests of the Parties and the Public Justify the Injunction.... 33

CONCLUSION ................................................................................................... 35

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*900 Broadway v. Altosgroups*,
    No. 4:20-CV-00461-NKL, 2020 WL 12675571 (W.D. Mo. Sept. 11,
    2020) ................................................................................................................ 30

*Agudath Israel of Am. v. Cuomo*,
    983 F.3d 620 (2d Cir. 2020)............................................................................ 35

*Ass'n of Equip. Mfrs. v. Burgum*,
    932 F.3d 727 (8th Cir. 2019) ........................................................................... 15

*Cigna Corp. v. Bricker*,
    103 F.4th 1336 (8th Cir. 2024) ....................................................... 13, 14, 33

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
    640 F.2d 109 (8th Cir. 1981) ........................................................... 14, 28, 29

*Entergy Arkansas, LLC v. Webb*,
    122 F.4th 705 (8th Cir. 2024) .............................................................. 16, 23

*Exxon Corp. v. Governor of Md.*,
    437 U.S. 117 (1978).......................................................................................... 24

*Fennell v. Butler*,
    570 F.2d 263 (8th Cir. 1978) ........................................................................... 29

*Firearms Regul. Accountability Coal., Inc. v. Garland*,
    112 F.4th 507 (8th Cir. 2024) ......................................................................... 14

*Gen. Motors Corp. v. Harry Brown's LLC*,
    563 F.3d 312 (8th Cir. 2009) ........................................................................... 30

*Hampton Feedlot, Inc. v. Nixon*,
    249 F.3d 814 (8th Cir. 2001) ........................................................................... 18

*Hazardous Waste Treatment Council v. State of S.C.*,
    945 F.2d 781 (4th Cir. 1991) ........................................................................... 33

*Hispanic Interest Coal. of Ala. v. Governor of Ala.*,
    691 F.3d 1236 (11th Cir. 2012) ...................................................................... 35

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ................................................................................ 29

*IESI AR Corp. v. Nw. Ark. Reg'l Solid Waste Mgmt. Dist.*,
433 F.3d 600 (8th Cir. 2006) ................................................................... 18

*Iowa Utils. Bd. v. F.C.C.*,
109 F.3d 418 (8th Cir. 1996) ................................................................... 30

*Katch, LLC v. Sweetser*,
143 F. Supp. 3d 854 (D. Minn. 2015) ...................................................... 31

*Laclede Gas Co. v. St. Charles Cnty., Mo.*,
713 F.3d 413 (8th Cir. 2013) ................................................................... 15

*Lamplighter Vill. Apartments LLP v. City of St. Paul*,
534 F. Supp. 3d 1029 (D. Minn. 2021) .................................................... 14

*Libertarian Party of Ark. v. Thurston*,
962 F.3d 390 (8th Cir. 2020) ................................................................... 28

*Lindell v. United States*,
82 F.4th 614 (8th Cir. 2023) ................................................................... 33

*Little Rock Fam. Plan. Servs. v. Rutledge*,
397 F. Supp. 3d 1213 (E.D. Ark. 2019) ................................................... 35

*Lowe v. City of Detroit*,
544 F. Supp. 3d 804 (E.D. Mich. 2021) ................................................... 35

*LSP Transmission Holdings, LLC v. Sieben*,
954 F.3d 1018 (8th Cir. 2020) .................................................. 16, 18, 23

*Mastrovincenzo v. City of New York*,
435 F.3d 78 (2d Cir. 2006) ..................................................................... 33

*Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*,
336 F.3d 801 (8th Cir. 2003) ............................................................ 14, 30

*Minn. Chamber of Com. v. Choi*,
707 F. Supp. 3d 846 (D. Minn. 2023) ...................................................... 28

*Missouri v. Biden*,
112 F.4th 531 (8th Cir. 2024) ..................................................... 14, 32, 33

iii

*Nat'l Pork Producers Council v. Ross*,
   598 U.S. 356 (2023) .................................................................. 15, 17, 23, 24

*Nebraska v. Biden*,
   52 F.4th 1044 (8th Cir. 2022) ............................................................. 29

*Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*,
   514 U.S. 175 (1995) ............................................................................ 16

*Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*,
   83 F.4th 658 (8th Cir. 2023) ............................................................... 29

*Pavek v. Simon*,
   467 F. Supp. 3d 718 (D. Minn. 2020) ........................................... 14, 34

*Pike v. Bruce Church, Inc.*,
   397 U.S. 137 (1970) ...................................................................*passim*

*Raffington v. Cangemi*,
   No. CIV. 04-3846JRTRLE, 2004 WL 2414796 (D. Minn. Oct. 22,
   2004) .................................................................................................. 30

*Reuters Ltd. v. United Press Int'l, Inc.*,
   903 F.2d 904 (2d Cir. 1990) ............................................................... 31

*Rodgers v. Bryant*,
   942 F.3d 451 (8th Cir. 2019) .............................................................. 15

*Rogers Grp., Inc. v. City of Fayetteville*,
   629 F.3d 784 (8th Cir. 2010) ........................................................ 14, 15

*S.D. Farm Bureau, Inc. v. Hazeltine*,
   340 F.3d 583 (8th Cir. 2003) .............................................................. 16

*Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*,
   997 F.2d 484 (8th Cir. 1993) .............................................................. 33

*SDDS, Inc. v. State of S.D.*,
   47 F.3d 263 (8th Cir. 1995) .......................................................... 16, 20

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   645 F.3d 978 (8th Cir. 2011) .............................................................. 29

*Smithfield Foods, Inc. v. Miller*,
   367 F.3d 1061 (8th Cir. 2004) ............................................................ 16

*Truesdell v. Friedlander*,
    80 F.4th 762 (6th Cir. 2023) ............................................................................ 24

*U & I Sanitation v. City of Columbus*,
    205 F.3d 1063 (8th Cir. 2000) ............................................................ 18, 19, 25

*United Healthcare Ins. Co. v. AdvancePCS*,
    316 F.3d 737 (8th Cir. 2002) ............................................................................ 30

**Statutes**

26 U.S.C. § 501(c)(6) ................................................................................................ 4

Minn. Stat. 115.071 ................................................................................................... 4

Minn. Stat. § 116.943 ....................................................................................... 1, 3, 4

Minn. Stats. § 116.072 .............................................................................................. 4

**Other Authorities**

U.S. Constitution ............................................................... 1, 5, 13, 1519, 34

27 Fed. Reg. 10098 (Oct. 13, 1962) ...................................................................... 10

47 Fed. Reg. 14698 (April 6, 1982) ....................................................................... 11

## INTRODUCTION

Plaintiff Cookware Sustainability Alliance ("CSA") brought this lawsuit challenging Minnesota Session Law – 2023, Chapter 60, Article 3, Section 21, codified as Minn. Stat. § 116.943 (the "Statute"). The Statute imposed a complete ban on the sale or distribution of cookware products containing intentionally added per- and poly-fluoroalkyl substances in the State of Minnesota ("Minnesota" or "the State") beginning January 1, 2025. These substances, often referred to as "PFAS," have been the subject of increasing public attention and regulatory scrutiny. The Statute seeks to regulate, or in some cases, eliminate, a wide range of products in which PFAS are intentionally added.

The Statute casts an incredibly wide net. It defines PFAS in such a broad way as to sweep in both potentially dangerous chemicals <u>and</u> also safe compounds with radically different structures and physical properties. This dragnet captures not only the problematic chemicals that have been the subject of public concern, but also the fundamentally safe and extremely useful compounds used to make nonstick cookware, all of which are FDA approved. It is the equivalent of banning the transport of any molecules containing exactly two hydrogen atoms out of fear of the volatility of explosive hydrogen gas — $H_2$ hydrogen gas may be dangerous, but $H_2O$ turns out to be very useful.

The Statute's prohibition against nonstick cookware is not merely ill-advised, it is also unconstitutional. The Statute does not limit its prohibition to the sale of products manufactured in Minnesota. Instead, it prohibits the sale or distribution in the State of banned products produced <u>anywhere</u>. As relevant here, *all* of the nonstick cookware prohibited by the Statute is manufactured outside of the State.

That is a constitutional problem under the Commerce Clause of the U.S. Constitution for two independent reasons. First, the Statute impermissibly discriminates against out-of-state commerce because it burdens only out-of-state cookware manufacturers, while leaving the only company that manufactures cookware within Minnesota unaffected. Second, the Statute is also unconstitutional under the Commerce Clause because it imposes a "substantial burden" on interstate commerce that outweighs its local benefits. Specifically, the Statute does not create local benefits because it bans cookware that poses no risk of harm to the public.

The State's unconstitutional ban is creating ongoing and irreparable harm for Plaintiff CSA's members by outlawing a significant portion of the products they make. For that reason, CSA is seeking to temporarily enjoin enforcement of the Statute against its members during the pendency of this action. Such relief is warranted because CSA is likely to succeed on the merits of its Commerce Clause claims, suffers irreparable loss of consumer goodwill while the Statute is in effect, and suffers greater harm from the cookware ban than the State suffers from a temporary delay in enforcement of the Statute. Moreover, the relief sought is narrowly targeted: CSA seeks only an injunction against the Statute as applied to its members' products; granting that relief would not frustrate the operation of the rest of the Statute or preclude the State's efforts to regulate PFAS chemicals that are of genuine concern.

Consequently, and for the reasons explained below, Plaintiff CSA respectfully requests that this Court grant its Motion and enjoin the enforcement of the Statute against its members during the pendency of this action.

2

## FACTUAL BACKGROUND

### A.    Minnesota Passes Amara's Law

On May 19, 2023, Governor Tim Walz signed Minnesota's new environment and natural resources finance and policy statute into law.  The new law, codified as Minn. Stat. § 116.943, imposed a complete ban on the sale or distribution of cookware products containing intentionally added per- and poly-fluoroalkyl substances in the State of Minnesota beginning January 1, 2025.

The Statute targets a broad array of products containing "intentionally added PFAS," banning sales inside Minnesota of products ranging from cookware to carpets to mattresses to textiles to electronics to ski wax.  This is the first law prohibiting the use of intentionally added PFAS in cookware to become effective in the US.

Section 21 of the Statute amends Chapter 60 of the Minnesota Statutes to, among other things, add a section prohibiting the sale or distribution of certain products in Minnesota.  *See* Statute § 5(a)(3). Specifically, the Statute states that "a person may not sell, offer for sale, or distribute for sale in this state the following products," one of which is cookware, "if the product contains intentionally added PFAS." Statute § 5(a).  Further, "Cookware" is defined to include "durable houseware items used to prepare, dispense, or store food, foodstuffs, or beverages," including but not limited to pots, pans, skillets, baking utensils and other common cookware items.  Statute  § 1(h).  "PFAS" are defined as "a class of fluorinated organic chemicals containing at least one fully fluorinated carbon atom."  Statute § 1(p).  "Intentionally Added" means "PFAS deliberately added during the manufacture of a product where the continued presence of PFAS is desired in the final

3

product or one of the product's components to perform a specific function." Statute § 1(l).

The Statute authorizes the Commissioner to bring suit in Minnesota court to remedy violations, *id.* § 7(a), and requires persons to furnish upon request to the Commissioner "any information they may have or may reasonably obtain that is relevant to show compliance with this section." *Id.* If a violation is found, the Statute authorizes a court to criminally prosecute up to a misdemeanor and impose a civil penalty up to $15,000 per day per violation, with each separate sale at an excessive price constituting a separate violation. *Id.* § 7(a); Minn. Stats. § 115.071 and § 116.072. Minnesota courts are also authorized to award restitution to the State and to enter injunctive relief. Statute § 7(a); § Minn. Stat. 115.071.

### B.    Cookware Sustainability Alliance

Plaintiff CSA is a 26 U.S.C. § 501(c)(6) incorporated non-profit business league organization organized under the laws of California. *See* Declaration of Stephen Burns In Support of Plaintiff's Motion for a Preliminary Injunction ¶ 2 (hereinafter "Burns Decl."). It is dedicated to educating consumers and policy makers through scientifically accurate information about the safety of cookware products in order to promote sound decision-making. *See id.* CSA's members are leading cookware manufacturers, all of which are located outside Minnesota, including Meyer Corporation U.S., Groupe SEB, and Tramontina. Each of CSA's member companies manufactures its cookware outside of Minnesota. *See id.* ¶¶ 15-18.

CSA's members produce cookware designed to contain "at least one fully fluorinated carbon atom." Specifically, CSA's members include "at least one fully

4

fluorinated carbon atom" in their fluoropolymer nonstick products in order to create their nonstick properties. *See* Burns Decl. ¶ 12 (listing PTFE, FEP, and PFA as fluoropolymers used to create nonstick surfaces); Declaration of Dr. Sarah Parker, Ph.D. In Support of Plaintiff's Motion for a Preliminary Injunction (hereinafter "Parker Decl.") at ¶ 10 (noting that the Statute's definition of "PFAS" "includes fluoropolymers such as PTFE, FEP, and PFA, which are used in cookware applications and elsewhere").  As a result, all the fluoropolymer nonstick cookware products manufactured by CSA's members (the "Targeted Products") are prohibited by the Statute.

C.    **The Nonstick Cookware Market**

Nonstick cookware containing fluoropolymers has been FDA-approved as safe for food contact for well over 60 years.  The chemical compounds used to create nonstick coatings in these types of cookware are fundamentally different from the kinds of pernicious PFAS chemicals that animate the Statute.  The Statute's indiscriminate definition of  "PFAS" means that the State ends up throwing out the good with the bad. And the burdens of that misguided regulation end up falling exclusively on out-of-state commercial actors, which violates the U.S. Constitution.

i.  **Available Cookware Surfaces**

The terms "cookware" and "bakeware" are used, in the cookware and bakeware industry, to refer to products created to be the surfaces on or in which food is cooked for human consumption.  *See* Burns Decl. ¶ 4.  "Cookware" refers to such products designed to be used primarily on stovetop, while "bakeware" refers to such products designed to be used primarily in an oven.  *See* Burns Decl. ¶ 4.  All cookware and bakeware sold in the

United States falls into one of two general categories: (1) products that include a nonstick coating ("Nonstick Products"), and (2) products that do not include such a coating ("Other Products"). *See id.* ¶ 5.

The Other Products category is made up of a wide variety products manufactured using a number of different materials, including: untreated metal substrates such as stainless steel, cast iron, aluminum, and steel; non-metal substrates such as stoneware and borosilicate glass; enameled substrates, whereby the cooking surface is a layer of enameled porcelain on top of a metal core; and various metal substrates that have some degree of pre-treatment to their surfaces or coatings. *See id.* ¶ 6.

In contrast, the Nonstick Products category is much more narrowly defined. There exist only three viable and commercially available technologies to create cookware that includes a nonstick coating: (1) fluoropolymer nonstick; (2) sol-gel; and (3) silicone-based nonstick. *See id.* ¶ 7. While silicone-based nonstick coatings have been successfully used with certain categories of bakeware, where they are exposed only to the comparatively lower temperatures of an oven, they are not generally used for cookware, which is regularly exposed to much higher temperatures. *See id.* ¶ 8. As a result, the only viable technologies to create nonstick cookware are fluoropolymers and sol-gel. *See id.* ¶ 9.

Sol-gel, which is the process used to make what is often referred to and marketed as "ceramic" nonstick cookware, consists of a coated cooking surface layered on top of a metal core. Because this so-called ceramic is not itself a nonstick surface, the sol-gel process creates a nonstick product by infusing the ceramic layer with a nonstick gel comprised of silicone oil. *See* Burns Decl. ¶ 10.

6

Fluoropolymer nonstick products, which represent the products traditionally and colloquially referred to as "nonstick" by consumers, are made by applying a coating of a fluoropolymer compound to a metal substrate. This fluoropolymer compound is inert, hydrophobic (repels water), naturally repels non-polar fats and oils, and has a high temperature resistance, all of which give the cookware its nonstick properties. *See id.* ¶ 11.

There are three different fluoropolymers used to create nonstick surfaces that are approved by the FDA. The most commonly used fluoropolymer in the industry is polytetrafluoroethylene ("PTFE"). It is sometimes colloquially referred to as Teflon, which is a particular brand name. *See id.* ¶ 12. Other fluoropolymers used to create nonstick cookware include fluorinated ethylene propylene ("FEP") and perfluoroalkoxy alkane ("PFA").

All fluoropolymers in use to create nonstick cookware have certain essential features in common. *See id.* In particular, their chemical composition consists of long chains of carbon atoms bonded together. *See id.* These carbon atoms form the spine of the polymer chain, along which fluorine and other atoms are bonded. *See id.*; Parker Decl. ¶ 8. This polymer backbone in the compounds used in nonstick cookware is perfluorinated,[1] substantially influencing the chemical and physical properties of these polymer materials.

"Ceramic" and fluoropolymer nonstick products differ in a number of significant

---

[1] A "perfluorinated" compound is one that consists of carbon and fluorine atoms bonded together without any of the carbon–hydrogen bonds that occur in other organic compounds. *See* Parker Decl. at 3, n.3.

ways. *See* Burns Decl. ¶ 13.  In terms of usability from the consumer perspective, however, the critical difference between the two is that fluoropolymer coatings are inherently nonstick, while the ceramic layer in a sol-gel system is not.  *See id*.  Instead, a sol-gel pan keeps its nonstick properties only as long as the silicone oil remains in the "ceramic" layer. *See id*.  For that reason, sol-gel ceramic cookware maintains its nonstick properties for significantly less time, and has a much shorter usable life for a consumer, than a fluoropolymer nonstick counterpart.  *See id*.

"Ceramic" nonstick and fluoropolymer nonstick products require substantially different production processes.  *See id*. ¶ 28.  Fluoropolymer nonstick coatings are flexible, allowing them to be applied either by (a) rolling the coating onto a metal disk, which then can be shaped into a pan for the final product, or (b) spraying the coating onto a pre-shaped product.  *See id*.  The ceramic layer in "ceramic" nonstick products, in contrast, is too hard to be shaped after application; consequently, the sol-gel process can only be sprayed.  *See id*.

The production processes for "ceramic" and fluoropolymer nonstick likewise involve different compounds sourced from different suppliers, different or modified furnaces, and different equipment.  *See id*. ¶ 30.  Thus, even where these processes share a spraying application in common, practically everything involved in the production process before and after spraying the coating is significantly different.  *See id*.

Consequently, existing production infrastructure designed to manufacture fluoropolymer nonstick products cannot be transitioned to a sol-gel manufacturing process easily or cheaply, and without a potentially substantial overhaul. In particular, the

manufacturing infrastructure that uses a rolling method to produce fluoropolymer nonstick products cannot be used to produce "ceramic" nonstick products without significant investments in new processes and equipment.  *See* Burns Decl. ¶ 31.

### ii.  The Cookware Market

The cookware market in the United States was estimated to generate over $4 billion in commerce in 2023.  *See id.* ¶ 19.  Nonstick Products represented 62.6% of that market, while Other Products represented the remaining 37.4%.  *See id.*  The "ceramic" nonstick cookware market is dominated by private label manufacturers and companies such as GreenPan, Blue Diamond, and Gotham Steel, none of which are members of CSA.  *See id.* ¶ 20. These companies have developed the production capacity and brand recognition to produce well over 60% of the of the ceramic cookware purchased in the United States in 2024.  *See id.*

All of CSA's member companies offer "ceramic" nonstick cookware products. However, those ceramic products represent a comparatively small, niche market in CSA's members' cookware product lines.  *See id.* ¶ 21.  In contrast, CSA's members supplied fully 47% of the fluoropolymer nonstick products sold in the United States in the twelve-month period ending September 2024, and 57% of the fluoropolymer nonstick products sold in the State of Minnesota during the same period.  *See id.* ¶ 22.

### iii.  Fluoropolymer Nonstick Products are Manufactured Exclusively Outside Minnesota.

As noted, CSA's membership consists of a number of cookware manufacturers, all of which are located outside Minnesota. There is only one cookware manufacturer located

in Minnesota. *See* Burns Decl. ¶ 23. That Minnesota-based producer, a company called Nordic Ware, does not produce fluoropolymer nonstick products. *See id.* ¶¶ 23-24.

Nordic Ware was founded in Minneapolis in 1946, and built its brand on introducing and trademarking the Bundt pan. *See id.* ¶ 25. Nordic Ware remains based in Minnesota. It is headquartered and has its manufacturing plant in the St. Louis Park suburb of Minneapolis. *See id.* Nordic Ware has expanded its product lines beyond the Bundt pan since its inception, but the majority of its business remains in bakeware rather than stovetop cookware. *See id.*

While Nordic Ware formerly manufactured a line of fluoropolymer nonstick products, that was only ever an ancillary part of its business. *See id.* ¶ 26. In 2024, it discontinued its fluoropolymer products altogether. *See id.* Its nonstick products are now exclusively of the so-called "ceramic" type. *See id.* As a result, since at least September 2024, 100% of the fluoropolymer nonstick products in the global market have been manufactured *outside* of Minnesota. *See id.* ¶ 27.

### D.    The Targeted Products Poses No Appreciable Risk to Minnesotans.

Nonstick cookware made using fluoropolymers, including the Targeted Products, has been repeatedly identified as safe by the FDA and other regulatory bodies. *See* Parker Decl. ¶¶ 15-17, 19. For that reason, PTFE- and FEP-based fluoropolymer nonstick cookware has been FDA approved for food contact as safe for human use and consumption since 1962. *See* 27 Fed. Reg. 10098 (Oct. 13, 1962). PFA-based fluoropolymer nonstick cookware has likewise been FDA approved for food contact as safe for human use and consumption since 1982. *See* 47 Fed. Reg. 14698 (April 6, 1982).

10

The fluoropolymers used in nonstick cookware (*i.e.*, PTFE, FEP, and PFA) are fundamentally different in their chemical structures and properties from the small-molecule fluorochemicals that are the subject of the State's concern. *See* Parker Decl. ¶ 12. It is these small-molecule fluorochemicals (e.g. perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA")) that have received significant attention in both public media coverage and from environmental regulators due to their detected presence in most drinking water sources. *See id.* ¶ 9.

The small-molecule PFAS of recent attention are pernicious because, among other reasons, they are migratable in water (meaning that they are either water-soluble or sit on the surface of water and can be transported with it), can be absorbed in the human body, and are transmitted through the water supply. *See id.* ¶ 12.

By contrast, fluoropolymers such as PTFE are useful in nonstick applications precisely because they are not water-soluble or migratable in water. To the contrary, they are stationary, inert, and hydrophobic. *See id*. If fluoropolymers such as PTFE had water solubility properties similar to small-molecule PFAS, they would be entirely unsuited to use as a nonstick coating. *See id.*

Fluoropolymers are regularly used in a host of other applications beyond cookware that would be impossible if those fluoropolymers shared properties in common with small-molecule PFAS. *See id.* ¶ 14. For instance, PTFE is used in medical devices implanted in the human body, such as pacemakers; PTFE could not be used as a component in implantable medical devices if it were water-soluble and capable of absorption by the body. *See* Parker Decl. ¶ 14.

11

The fluoropolymers used in the Targeted Products are incapable of creating or breaking down into the small-molecule PFAS with which the State is concerned. *See id.* ¶ 18. Further, these fluoropolymer materials have been shown to contain only "negligible" amounts of PFAS that can migrate to food, and are not a source of small-molecule PFAS after use for cooking, cleaning, or disposal. *See* Parker Decl. ¶ 18. As a result, despite falling within the definition of "PFAS" set forth in the Statute, the fluoropolymers used in the Targeted Products are not a significant source of the small-molecule PFAS with which the State is concerned. *See id.* The fluoropolymer nonstick products created by CSA's members present no appreciable risk of exposing Minnesotans to small-molecule PFAS, either directly through their use as cookware or indirectly through environmental contamination.

In contrast, the primary sources of small-molecule PFAS contamination are not even regulated by the Statute. In particular, numerous studies have demonstrated that the primary source of human exposure to small-molecule PFAS comes from sources that contribute to drinking water: wind, rain, and flowing water in the form of lakes, rivers, and runoff. *See id.* ¶ 21 (noting that the Agency for Toxic Substances and Disease Registry names PFAS-containing drinking water as a significant source of human exposure).

Nothing in the Statute's prohibitions — and in particular nothing in the Statute's regulation of the Targeted Products — purports to do anything to curb these sources of small-molecule PFAS. As a result, the Statute fails to convey a public benefit in two ways: it prohibits the sale of products that that have been evaluated and found to be safe for use by FDA, while at the same time doing nothing to regulate the primary source of the small-

molecule PFAS contaminants with which it is ostensibly concerned.

### E.    Procedural History

Plaintiff CSA filed the Complaint in this matter on January 6, 2025. The Complaint sets forth claims for relief under the Commerce Clause of the U.S. Constitution. It also separately challenges the Statute on First Amendment and federal preemption grounds.[2] In order to postpone enforcement of the Statute while those claims are resolved, Plaintiff now seeks an order from this Court enjoining enforcement of the Statute against its members during the pendency of this action.

## ARGUMENT

### I.    Legal Standard

The Court should exercise its equitable authority to suspend enforcement of the Statute while this litigation is resolved. The injunction CSA seeks here — namely, to prevent enforcement of a seriously constitutionally deficient law while those constitutional questions are resolved — is precisely the sort of injunction courts regularly order.

The Court's discretion in ruling on a request for a preliminary injunction is guided by the traditional four-factor test. *See Cigna Corp. v. Bricker*, 103 F.4th 1336, 1343 (8th Cir. 2024). A preliminary injunction is warranted when a plaintiff can show: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in its favor; and (4) an injunction is

---

[2] Plaintiff's claims on First Amendment and preemption grounds challenge Subsection 2 of the Statute (the "Disclosure Requirement"), which does not go into effect until January 1, 2026. In the interest of narrowing the issues for the Court and the parties, Plaintiff is making the instant motion for a preliminary injunction only on the basis of its Commerce Clause claims.

in the public interest. *See Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 517 (8th Cir. 2024); *Missouri v. Biden*, 112 F.4th 531, 536 (8th Cir. 2024); *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). No single factor is determinative; however, the probability of success is the most significant. *Biden*, 112 F.4th at 536. A party suffers irreparable harm whenever it has no adequate remedy of law, typically because its injuries cannot be fully compensated through an award of damages. *Rogers Grp., Inc. v. City of Fayetteville*, 629 F.3d 784, 789 (8th Cir. 2010). The Eighth Circuit has previously held that loss of goodwill among customers was sufficient to establish a threat of irreparable harm. *See id.*; *see also Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003). The third and fourth factors (balance of the equities and public interest, respectively) for a preliminary injunction merge when the preliminary injunction is sought against the government. *Biden*, 112 F.4th at 538 (citing *Cigna Corp.*, 103 F.4th at 1347).

Courts regularly award preliminary injunctions when, as here, the plaintiff, facing the threat of injurious state action, seeks to preserve the pre-enforcement status of the parties while the matter is litigated on the merits. *See, e.g.*, *Lamplighter Vill. Apartments LLP v. City of St. Paul*, 534 F. Supp. 3d 1029 (D. Minn. 2021) (granting a preliminary injunction preventing City from enforcing ordinance pending resolution of plaintiffs' Takings Clause challenge); *Pavek v. Simon*, 467 F. Supp. 3d 718 (D. Minn. 2020) (granting preliminary injunction preventing Minnesota's Secretary of State from enforcing statute that plaintiffs alleged impermissibly burdened their right to vote); *Rogers Grp.*, 629 F.3d 784 (affirming grant of preliminary injunction preventing City's enforcement of rock

14

quarry regulation that would result in the business losing $13,000 a week); *Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d 727 (8th Cir. 2019) (affirming grant of preliminary injunction preventing North Dakota from enforcing statute plaintiffs claimed violated the Contract Clause); *Rodgers v. Bryant*, 942 F.3d 451 (8th Cir. 2019) (affirming grant of a preliminary injunction preventing Arkansas from enforcing anti-loitering law plaintiffs claimed violated their free speech); *Laclede Gas Co. v. St. Charles Cnty., Mo.*, 713 F.3d 413 (8th Cir. 2013) (affirming grant of preliminary injunction preventing County from forcing plaintiff to relocate gas lines without adequate compensation).

For the reasons that follow, each of these factors unequivocally supports the entry of an injunction in CSA's favor as to the Targeted Products during the pendency of this action. The Court should therefore grant CSA's Motion.

## II.   An Injunction Preserving the Status Quo is an Appropriate Exercise of this Court's Equitable Authority.

### A.   Plaintiff's Claims are Likely to Succeed.

#### 1.   The Statute Violates the Dormant Commerce Clause.

##### i.   *The Dormant Commerce Clause*

The Constitution expressly entrusts to Congress the power to "regulate Commerce . . . among the several States." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (quoting U.S. CONST. art. I, § 8, cl. 3). That enumerated power is both affirmative and negative; Congress may legislate, and the individual states are precluded from legislating in any way that undermines that affirmative power. Thus, even if Congress has not exercised its regulatory authority, the Commerce Clause "contain[s] a further, negative command" — known as the Dormant Commerce Clause, that prohibits "certain state

[economic regulation] even when Congress has failed to legislate on the subject." *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995). Commerce between the states is the exclusive prerogative of the national government, and a single state may not promote its own economic advancement at the expense of the citizens of other states.

A state violates the Dormant Commerce Clause in one of two ways. First, a law is suspect and subject to strict scrutiny, "if it 'overtly discriminates' against interstate commerce — either facially or through 'a discriminatory purpose or a **discriminatory effect**.'" *Entergy Arkansas, LLC v. Webb*, 122 F.4th 705, 711 (8th Cir. 2024) (quoting *LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018, 1026 (8th Cir. 2020) (emphasis added)). "Discriminatory effect" is sufficient to trigger strict scrutiny, even in the absence of intentional discrimination or economic protectionism. *See SDDS, Inc. v. State of S.D.*, 47 F.3d 263, 270 (8th Cir. 1995) ("even if South Dakota had not openly declared a discriminatory purpose, the referendum is discriminatory in its effect, and this type of discrimination will also trigger strict scrutiny"); *see also Smithfield Foods, Inc. v. Miller*, 367 F.3d 1061, 1065 (8th Cir. 2004); *S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 593 (8th Cir. 2003). Second, a state's law "may also be struck down for imposing a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits.'" *Id.* (quoting *LSP Transmission*, 954 F.3d at 1026, and *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). This second category of claims are sometimes referred to as "*Pike* claims," after the Supreme Court case that established the balancing test used to evaluate

burdens on interstate commerce.[3]

Here, however, the State's law is doubly flawed. The Statute *both* impermissibly discriminates against out-of-state commerce <u>and</u> imposes a substantial burden on interstate commerce that is unjustified by its putative local benefits. In particular, the Statute is an unconstitutional violation of Congress's Dormant Commerce Clause authority as applied to Plaintiff and its member companies. The State's prohibition on the sale of the Targeted Products is a burdensome regulation of commerce beyond the state's authority, and the Court should enjoin enforcement of the Statute as applied to the Targeted Products pending a full review of the law's constitutionality.

> ii. *The Statute Impermissibly Discriminates Against Out-of-State Commerce.*

First, the Statute is unconstitutional because it discriminates against out-of-state commerce. This constitutional inquiry can rest on the practical impact of a State's regulation alone, without regard to its intent. That practical effect is clear: Beginning on January 1st, the Statute prohibited the sale of products made outside of Minnesota.

---

[3] The two species of Dormant Commerce Clause violations are closely related, and a law that discriminates against out-of-state commerce may also fail the *Pike* test. However, the Supreme Court recently clarified that discrimination is *not* a necessary element for every Dormant Commerce Clause challenge, and that *Pike* claims remain viable even when they "do not allege discrimination or a burden on an artery of commerce." *Pork Producers*, 598 U.S. at 392 (Sotomayor, J., concurring). The Supreme Court's most recent Dormant Commerce Clause decision, *Pork Producers*, was extremely fractured. In one of the concurring opinions, however, Justice Sotomayor emphasized that the Court's opinions, read together, permit non-discriminatory *Pike* claims. *See id.* ("*Pike* claims that do not allege discrimination or a burden on an artery of commerce are further from *Pike*'s core. As THE CHIEF JUSTICE recognizes, however, the Court today does not shut the door on all such *Pike* claims. Thus, petitioners' failure to allege discrimination or an impact on the instrumentalities of commerce does not doom their *Pike* claim.").

Simultaneously, the only cookware company that manufactures products in Minnesota evaded the Statute's reach and likely received a boost in sales in Minnesota as a result of the exclusion of the non-Minnesota-made products. *See* Burns Decl. ¶¶ 23-27. The result, regardless of intent, is discriminatory: The Statute punishes <u>only</u> commerce outside the State while sparing the only producer within its borders.

Courts strike down laws, such as the Statute here, that discriminate against interstate commerce "unless the state or locality can demonstrate, 'under rigorous scrutiny, that it has no other means to advance a legitimate local interest.'" *LSP Transmission*, 954 F.3d at 1026 (quoting *Hampton Feedlot, Inc. v. Nixon*, 249 F.3d 814, 818 (8th Cir. 2001)). Such discrimination need not appear in the explicit statutory text; "even if it is facially neutral, the law may have a discriminatory purpose or a discriminatory effect." *U & I Sanitation v. City of Columbus*, 205 F.3d 1063, 1067 (8th Cir. 2000). Thus, a state law triggers strict scrutiny when it imposes a discriminatory impact on interstate commerce. And a law need only "favor[] in-state economic interests over out-of-state interests" to "discriminate[] in effect." *LSP Transmission*, 954 F.3d at 1030 (quoting *IESI AR Corp. v. Nw. Ark. Reg'l Solid Waste Mgmt. Dist.*, 433 F.3d 600, 605 (8th Cir. 2006)).

(1)    The Statute Creates a Discriminatory Effect.

There can be no question that the Statute results in a discriminatory effect on out-of-state interests. The cookware manufacturing industry is dominated by a relatively small number of manufacturers, who together are responsible for the overwhelming majority of the market share for consumer products. *See* Burns Decl. ¶ 14. Of those producers, there is exactly **one** located in Minnesota: Nordic Ware. *See id.* ¶ 23.

18

Nordic Ware does not produce fluoropolymer nonstick products. *See id.* ¶ 24. As a result, it is unaffected by the Statute's cookware ban. Everything else that is produced for the consumer cookware industry — and 100% of the fluoropolymer nonstick products — is manufactured, distributed, and sold from outside Minnesota. *See id.* ¶ 27. This out-of-state commerce is, consequently, the sole subject impacted by the cookware ban in the Statute.

The concrete, practical implications of this law are starkly discriminatory: Since Day 1 of its enforcement, the Statute has prohibited the sale of cookware products made *only* by out-of-state producers but imposed no burden on their sole competitor based in Minnesota. In other words, although the ban is facially neutral, in practice and effect it "favors [the] in-state economic interests" of the only cookware manufacturer in Minnesota while burdening only out-of-state manufacturers with a ban.

It is important to emphasize that proof of whether this discriminatory effect was intentional is unnecessary to succeed on the merits of Plaintiff's claim; *regardless* of the Legislature's intent, a state regulatory scheme that imposes a disparate impact on out-of-state commerce violates the Federal Constitution. *See, e.g.*, *U & I Sanitation*, 205 F.3d at 1067. The State's cookware ban creates a discriminatory effect because the Statute's prohibitions only impact out-of-state manufacturers. The Statute therefore places an impermissible thumb on the scale for a Minnesota manufacturer at the expense of the rest of the country's manufacturers. That is precisely the kind of parochial favoritism — regardless of intent — that the Dormant Commerce Clause forbids.

(2)    The Statute Cannot Survive Strict Scrutiny.

The Statute's discriminatory effect triggers strict scrutiny, which it cannot survive. The State cannot demonstrate that the cookware ban, as applied to Plaintiff and its member companies, advances a legitimate state interest that the State cannot address by any other means. *See, e.g.*, *SDDS, Inc.*, 47 F.3d at 271-72 (holding a South Dakota referendum attempting to exclude out-of-state trash had a discriminatory effect and failed to survive strict scrutiny because the referendum provided no local benefit and a nondiscriminatory alternative was available). The Statute purports to serve the health and welfare of Minnesota citizens. In fact, however, the prohibition on the Targeted Products does not promote that goal at all.

The Statute's preferential treatment of in- versus out-of-state manufacturers is not narrowly tailored, and it does not promote Minnesotans' health for at least three reasons.[4] *First*, the Statute as a whole imposes a blanket ban on all PFAS, an extremely broad category of chemicals, without distinction between their varying chemical compositions or applications. **As a matter of objective scientific fact, the fluoropolymer compounds used in nonstick cookware are not the small molecule PFAS that animate the State's**

---

[4] Not only does the Statute fail to advance the health of Minnesota citizens, it also imposes significant and unnecessary local injuries. Removing fluoropolymer nonstick products from the Minnesota market means consumers will need to switch to ceramic alternatives. Ceramic pans are both more expensive and less durable, meaning Minnesota consumers will be forced to incur substantial additional financial burdens to achieve the same useful product life. *See* Burns Decl. ¶ 13 (observing that "sol-gel ceramic" cookware "has a much shorter usable life for a consumer" because it loses its nonstick properties, requiring more frequent replacement). Likewise, the switch to ceramic pans will cause a *greater* burden on the Minnesota environment: ceramic pans must be replaced more often than nonstick, meaning more pans in Minnesota landfills for each consumer. *See id.*

**health concerns**.  Indeed, multiple regulatory authorities have carefully examined and regularly confirmed the safety of fluoropolymers for food contact as used in nonstick cookware.  *See* Parker Decl. ¶¶ 15, 17-19 (documenting the consistent approval by FDA and other regulators, and the scientific consensus that "negligible amounts of PFAS in [fluoropolymer] coating can migrate to food").

This broad, indiscriminate prohibition is the equivalent of banning the transport of any molecules containing exactly two hydrogen atoms out of fear of the volatility of explosive hydrogen gas — $H_2$ hydrogen gas may be dangerous, but $H_2O$ turns out to be very useful.  Categorically banning a diverse group of more than 15,000 chemical compounds to prevent the potential health impacts of a small subset throws the baby out with the bathwater.  The cookware ban's sweeping and undifferentiated prohibition on PFAS is the opposite of narrow tailoring.

*Second*, the Statute does not advance the State's interest — at least, as applied to the Targeted Products — because the scientific evidence shows that the fluoropolymer compounds used in the Targeted Products pose no risk to consumer health and safety.  As noted above, fluoropolymer applications in nonstick cookware have been approved for food contact use by the FDA since the 1960s and have been consistently found to pose no risk to consumers from their use in food preparation.  *See id.* ¶ 15.  Likewise, the overwhelming scientific consensus agrees that the fluoropolymers used in nonstick cookware are <u>not</u> a toxicological hazard because they are <u>not</u> absorbable by the human digestive tract.  *See id.* ¶ 17.  For instance, in 2016 the European Food Safety Authority (EFSA) found that PTFE, due to its molecular size, will not likely be absorbed through the

21

gastrointestinal barrier, and therefore concluded it does not present a health hazard.  *See* Parker Decl. ¶ 19.  The Targeted Products, therefore, do not pose a risk to Minnesotans who use them to cook.  And, just as fluoropolymers pose no meaningful risk as a source of small molecule PFAS when used for cooking, they similarly do not present a risk of transferring such PFAS to the environment once thrown away.  *See id.* ¶ 12 ("The large size and lack of water-soluibilizing functional groups in fluoropolymers result in materials that do not have surfactant properties, are considered immobile in the environment[.]"), ¶ 18.  As a result, banning the Targeted Products does nothing at all to serve any health or wellness goal the State envisioned.

*Third*, more effective means exist to address the State's concerns with small molecule PFAS (which the Targeted Products do not contain).  As discussed, the cookware ban is a scientifically *in*effective tool to address that concern.  Instead, the primary risk to Minnesotans from PFAS comes from small molecules capable of accumulating in the human body and other bodies in the human food chain — a process known as bioaccumulation.  The principal source for such toxins, however, comes from meteorological trends and the water cycle.  *See id.* ¶ 21.  The very features that make such small-molecule PFAS capable of bioaccumulation also make them water soluble, meaning they proliferate without regard to state lines by evaporation, condensation, and the movement of water throughout the continent's rivers and lakes.  In other words, a ban that seeks to keep a nonstick skillet made in Texas out of a Minneapolis landfill does nothing

at all to prevent PFAS infiltrating via rain from the Dakotas or runoff from Canada.[5]

In short, the Targeted Products are "collateral damage" from an overbroad, sweeping, and indiscriminate attempt to regulate in this area, motivated by a concern over a *different* family of PFAS compounds. The collateral damage the Statute inflicts cannot satisfy the searching judicial review of strict scrutiny. The State cannot make a sufficient showing to justify the discriminatory effect of its cookware ban on interstate commerce. Plaintiff is therefore highly likely to succeed on the merits of its Dormant Commerce Clause challenge, as applied to the Targeted Products.

### *iii. The Statue Places an Unjustifiable Burden on Interstate Commerce.*

Separate from the Statute's discriminatory effect, it also violates the Dormant Commerce Clause because it places an undue and excessive burden on interstate commerce. A state economic regulation violates the Dormant Commerce Clause when it (a) imposes a substantial burden on interstate commerce, *see Pork Producers*, 598 U.S. at 383-84,[6] and (b) that burden is "clearly excessive in relation to the putative local benefits." *Entergy Arkansas*, 122 F.4th at 711 (quoting *LSP Transmission*, 954 F.3d at 1026). The Statute's cookware ban fails on both grounds.

---

[5] And, of course, the fluoropolymer compound in the Texas skillet cannot create the kind of small molecule PFAS in the Dakota raincloud anyway.

[6] Although the Justices disagreed about how to assess whether the petitioner in *Pork Producers* had properly pleaded a "substantial burden," a controlling majority agreed that the Dormant Commerce Clause analysis requires a showing of a substantial burden on interstate commerce before a court applies the *Pike* balancing test. *See* 598 U.S. at 383-84 (four-Justice plurality concluding that petitioners' claim failed for failure to adequately allege a substantial burden on interstate commerce), and 598 U.S. at 393-94 (Barrett, J., concurring in part, and concluding that petitioners plausibly alleged such a substantial burden).

While courts have had little opportunity to expound on the "substantial burden" requirement the Supreme Court established in *Pork Producers*, both the Supreme Court's opinion and subsequent decisions demonstrate that the Statute here imposes such a burden. A majority of the Justices in *Pork Producers* agreed that *Pike* claims are most viable, and a substantial burden on interstate commerce easiest to establish, where the challenged law discriminates in some way against out-of-state commerce. *See Pork Producers*, 598 U.S. at 377-79 (plurality opinion), *id.* at 391-92 (Sotomayor, J., concurring in part); *see also Truesdell v. Friedlander*, 80 F.4th 762, 774-75 (6th Cir. 2023) (noting that the plaintiff had "not gotten off to an 'auspicious start'" in proving a substantial burden" for *Pike* claim purposes because it, <u>unlike</u> the CSA here, *failed* to demonstrate that the challenged law had a discriminatory effect). As discussed extensively above, the Statute at issue here undoubtedly imposes such effects, and therefore "falls well [inside] *Pike*'s heartland." *Pork Producers*, 598 U.S. at 380. And in both *Pork Producers* and in subsequent cases, courts have emphasized that the substantial burden must stretch beyond costs imposed on a particular out-of-state company to impact out-of-state *commerce. See Pork Producers*, 598 U.S. at 384 ("If the dormant Commerce Clause protects the 'interstate market . . . from prohibitive or burdensome regulations,' . . . it does not protect 'particular . . . firms' or 'particular structure[s] or methods of operation.'") (quoting *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127-28 (1978) (all but second alteration in original); *Truesdell*, 80 F.4th at 774 (emphasizing that the burdens relevant for *Pike*-test purposes are "only *interstate-commerce* burdens" (emphasis in original)).

Here, unlike cases that simply made it more *expensive* for an out-of-state company

24

to comply with state regulation, the Statute bans an entire class of products. That prohibition has cascading effects throughout interstate commerce that reach far beyond CSA's members. The suppliers of the raw chemicals necessary to produce fluoropolymers, the chemical producers of the fluoropolymers, and the manufacturers of essential components in the distribution system for such fluoropolymers all suffer from the prohibition of fluoropolymer nonstick products. Indeed, consideration of the sheer number and diversity of participants in interstate commerce who are impacted by the Statute's ban is staggering:[7] factory workers who make tanks used to store and transport fluoropolymers; machinists who produce the parts to maintain the roller-production facilities that cannot be adapted to the fabrication of "ceramic" nonstick; trucking and logistics companies that must put in place additional administrative controls to ensure that prohibited Target Products are not mistakenly shipped to Duluth instead of Dallas; all of these and more are actors in interstate commerce *beyond* CSA's members who suffer burdens from the Statute's cookware ban.

---

[7] Moreover, the Court's evaluation of substantial burdens is not limited to the burdens caused by just the Statute. Rather, in order to appreciate the magnitude of the burden on interstate commerce, the Court must adopt an aggregate analysis whereby it considers the interstate effect on the market if several jurisdictions were to adopt similar ordinances. *U & I Sanitation v. City of Columbus*, 205 F.3d 1063, 1069 (8th Cir. 2000) ("[T]he practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation."). Thus, the relevant effect on actors up and down the supply chain is not merely the impact of fluoropolymer nonstick being prohibited in *just* Minnesota; it is the cumulative effect of many states implementing such bans. Indeed, an inconsistent patchwork of potentially contradictory state regulations is precisely the danger the Commerce Clause seeks to prevent by making regulation of interstate commerce the exclusive prerogative of Congress.

25

Thus, as a threshold matter, the Statute imposes a substantial burden on interstate commerce. It forces out-of-state manufacturers to either (a) comply with the law by undertaking significant changes to their product lines, entailing massive losses for non-compliant products that have already been manufactured and delivered as well as reverberating impacts across their supply chains throughout the country, or (b) completely exit the market in an entire region of the country, thereby impacting not only Minnesota consumers but customers in surrounding states, as well. Even the choice to exit the Minnesota market would cause cascading burdens throughout manufacturers' interstate supply chains.

The Statute forces Plaintiff's members to pick between three bad alternatives: (1) withdraw from the Minnesota market entirely and lose millions of dollars in revenue and customer goodwill, (2) incur millions of dollars in unnecessary expenses and disrupt a global market to transition their nonstick products entirely to a sol-gel ceramic alternative for all consumers, or (3) incur similar costs to create entirely new production capacity, with the associated supply chains, to produce sol-gel ceramic products exclusively for the Minnesota market. This choice — which is imposed only on manufactures outside of Minnesota, as a practical reality — is burdensome in and of itself. Moreover, any option entails its own substantial burdens on interstate commerce.

Compliance with the Statute's ban on the Targeted Products is not a matter of simply throwing a switch from fluoropolymer to "ceramic" on the factory wall. As discussed above, so-called "ceramic" nonstick produced using a sol-gel method is the only viable alternative to making a nonstick pan without fluoropolymers, which consumers nationwide

26

overwhelmingly prefer to uncoated cookware.  *See* Burns Decl. ¶¶ 9, 19.  And the manufacturing infrastructure that already exists to produce fluoropolymer nonstick cannot easily be adapted to sol-gel ceramic production.  *See id.* ¶ 31.  Indeed, much of CSA's members' production capacity is built around a rolling production method that cannot be adapted to ceramic production at all.  *See id.*

Out-of-state commercial actors will suffer certain burdens regardless of whether CSA's members attempt to build sufficient production capacity to satisfy demand in Minnesota with "ceramic" nonstick products or exit the market completely.  First, the Statute's imposition of its prohibition without adequate lead time for manufacturers to adapt has forced CSA's members to bear losses from already-manufactured product that is now prohibited in the State.  Second, in order to avoid transgressing the Statute, CSA's members must take steps to ensure that Targeted Products are not *unintentionally* distributed in Minnesota.  As a practical matter, CSA's members must effectively extend Minnesota's ban beyond its borders to consumers in the surrounding states in order to ensure that fluoropolymer nonstick products bound for Madison do not end up in Mankato.

These substantial burdens are "clearly excessive" in light of the putative local benefits because, as discussed above, the cookware ban is devoid of local benefits.  Consequently, the *Pike* analysis for this Court is simple: A **single** burden on interstate commerce would be clearly excessive when the prohibition on the Targeted Products conveys *no meaningful benefits*.  As discussed at length above, the ban on the FDA-approved Targeted Products provides no health benefits to Minnesotans because the Targeted Products pose no health risks to Minnesotans.  Fluoropolymer nonstick cookware

27

is specifically designed to not release fluorochemical PFAS to either food after cooking or the environment after disposal. Even if such cookware were subjected to such atypical abuse that it did shed incidental fluoropolymers, **those polymers are too large to be absorbed by the body anyway**. *See* Parker Decl. ¶ 12. The Statute's ban, at least as applied to the Targeted Products, is pointless. The result is a massive upheaval in the out-of-state cookware market causing cascading effects both up the stream of commerce from Plaintiff's members — such as out-of-state producers in their supply chains — and downstream to consumers in the states surrounding Minnesota. And for all that economic tumult, the Statute's ban of the Targeted Products fails to deliver a single local benefit to Minnesota citizens. The Statute therefore fails the balancing test required by *Pike* and violates the Dormant Commerce Clause.

\*    \*    \*

In sum, as applied to the Targeted Products, the Statute is unconstitutional in two independently sufficient ways. First, it is an impermissibly discriminatory regulation that cannot survive strict scrutiny. Second, it imposes a substantial and undue burden on interstate commerce outweighing any actual local benefit. Failure on just one of these grounds would be sufficient to grant the requested injunction, but the Statute fails both. Consequently, Plaintiff is highly likely to succeed on the merits of its claim in demonstrating that the Statute is unconstitutional.

### B.    Plaintiff Will Suffer Irreparable Harm if Enforcement of the Statute is Not Stayed During the Pendency of this Action.

Enforcement of the Statute must be enjoined while this action is resolved because

Plaintiff and its member companies face irreparable harm from its enforcement. The second, well-known requirement for every injunction is a showing of irreparable harm. *See Libertarian Party of Ark. v. Thurston*, 962 F.3d 390, 399 (8th Cir. 2020) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 114 (8th Cir. 1981)). A representative association, like Plaintiff CSA, suffers an irreparable injury whenever one of its members suffers an irreparable injury. *See, e.g.*, *Minn. Chamber of Com. v. Choi*, 707 F. Supp. 3d 846, 856 (D. Minn. 2023) (finding non-profit membership organization was an association that may seek injunctive relief to prevent injury to its members as a representative of those members).[8] "In balancing the equities no single factor is determinative." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). In circumstances "where the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less." *Nebraska v. Biden*, 52 F.4th 1044, 1046 (8th Cir. 2022); *see also Fennell v. Butler*, 570 F.2d 263, 264 (8th Cir. 1978) ("If the

---

[8] Courts in this Circuit apply the traditional test for irreparable harm for representative associations without any additional requirement that the association show a risk of some harm to itself distinct from the irreparable harm to its members. *See Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 667 (8th Cir. 2023) (finding association of parents challenging a law as violative of the first amendment would suffer irreparable injury under the Eighth Circuit's test for preliminary injunctions) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)); *Sierra Club v. U.S. Army Corps of Eng'rs,* 645 F.3d 978 (8th Cir. 2011) (analyzing association's motion for preliminary injunction under same standard that applies to individuals); *cf. Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977) ("Even in the absence of injury to itself, an association may have standing solely as the representative of its members . . . . If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." (internal quotations omitted)).

balance tips decidedly towards the plaintiffs and the plaintiffs have raised questions serious enough to require litigation, ordinarily the injunction should issue."); *Raffington v. Cangemi*, No. CIV. 04-3846JRTRLE, 2004 WL 2414796, at *1 (D. Minn. Oct. 22, 2004) (noting "the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiffs will suffer absent the stay."). Likewise, where as here, CSA has made a compelling showing about the constitutional infirmities of the Statute and of its likelihood of succeeding on the merits, the amount and certainty of an irreparable injury need not be as high as a case where the merits of the movant's claims are more equivocal.

While traditionally monetary losses are not irreparable, injuries to a business in the form of losses can be when they are not fully compensable with money damages. For instance, the loss of intangible assets such as reputation, consumer goodwill, and brand loyalty is an irreparable harm, even though such losses are generally only measurable by altered customer behavior. *See Med. Shoppe Int'l,* 336 F.3d at 805 (describing the moving party's loss of "intangible assets such as reputation and goodwill" in support of awarding injunctive relief); *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996).

Monetary damages are inadequate to compensate CSA's members for "loss of goodwill, impacts to agreements with other entities, and impacts to other projects because this reputational damage cannot be remedied by a later award of money damages." *See 900 Broadway v. Altosgroups*, No. 4:20-CV-00461-NKL, 2020 WL 12675571, at *5 (W.D. Mo. Sept. 11, 2020) (citing *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002); *see also Gen. Motors Corp. v. Harry Brown's LLC*, 563 F.3d 312, 319 (8th

30

Cir. 2009) (finding that a party has no adequate remedy at law when its injuries cannot be fully compensated through an award of damages, including injuries to goodwill and relationships that are difficult to quantify); *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 909 (2d Cir. 1990) (reversing district court, entering preliminary injunction, and observing irreparable harm "often consists of lost customers and competitive disadvantage from distributor's inability to supply customers with terminated product."). Likewise, "[l]ost profits that are difficult to quantify may constitute irreparable harm." *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 874 (D. Minn. 2015) (noting the moving party bears the burden of showing lost profits would be difficult to quantify such that money damages would be difficult to ascertain).

The prospect of lost goodwill and difficult to quantify damages is all the more potent here because the subject of the Statute's prohibition is cookware. In the case of durable goods like cookware, there may be only a few, limited opportunities to sell a product to an individual consumer. Most consumers will use their cookware for years, if not decades, and a customer who buys a new pot or pan while the Statute is effect is unlikely to be in the market for another for years at a time. That fact makes losses difficult to quantify, and serves to magnify the loss of goodwill; by the time a customer has been using a competitor's product for years at a time, the loss to brand loyalty is likely to be far more significant than it would be for a different, more disposable category of goods.

Here, Plaintiff's members face ongoing, irreparable harm to their intangible business assets. The Targeted Products became illegal in Minnesota on January 1, 2025. The departure of Plaintiff's member companies' signature brands from the Minnesota

market is inflicting significant, ongoing injury to the brand loyalty of Minnesota consumers. Even if the member companies eventually transition to exclusively sell ceramic or untreated alternatives to nonstick products (which is unlikely), that transition and business interruption would damage their goodwill and reputation with consumers. Market research consistently reveals that consumers prefer traditional nonstick cookware over ceramic and other alternatives. *See* Burns Decl. ¶ 19. Being forced to sell a less popular product will harm the manufacturers' reputation and consumer goodwill which, although intangible, are critical business assets that cannot be easily recovered once lost. And for brands that have primarily built their reputations in the nonstick cookware space, like Plaintiff's member companies, transitioning to a ceramic product risks a loss of market share to more well-established ceramic competitors.

Indeed, events after the Statute was enacted demonstrate the likelihood of these harms. In just the past few months, Minnesota distributors have cancelled or failed to renew orders for traditional nonstick cookware. *See* Burns Decl. ¶ 32. That manufacturers have suffered significant economic losses before the cookware ban is operational only demonstrates the reality and imminence of the Statute's impact now that it is effective. With each passing day, the members' economic and reputational losses increase exponentially and risk becoming irreversible.

Preliminary injunctions are designed to forestall precisely these risks of irreparable harm. Here, that risk weighs strongly in favor of enjoining the Statute, as applied to the Targeted Products, during the pendency of this action.

### C.    The Interests of the Parties and the Public Justify the Injunction.

The interests of the Plaintiff, the State, and the public all support enjoining the Statute.  Before issuing an injunction, courts balance the equities between the parties, comparing the harm the Plaintiff seeks to avoid to the injury the injunction may inflict on the other parties.  *See, e.g.*, *Biden*, 52 F.4th at 104 (finding "the equities strongly favor an injunction considering the irreversible impact the Secretary's debt forgiveness action would have as compared to the lack of harm an injunction would presently impose").  Courts likewise evaluate the public interest in the injunction.  *Id.*  Where, as here, the injunction is sought against the government, these factors collapse into the same inquiry.  *Biden*, 112 F.4th at 538 (citing *Cigna Corp.*, 103 F.4th at 1347).

In this case, an injunction would do no more than temporarily perpetuate the pre-January 1st status quo with respect to the Targeted Products while this action proceeds.  Any injury the State might suffer in delaying enforcement as to the Targeted Products pales in comparison to the irreparable harms Plaintiff and its member companies will endure from continued enforcement of the Statute.  Similarly, there is no harm to the public interest from a temporary delay in the enforcement of an unconstitutional law that provides no meaningful benefits to the public in the first place.

The balance of the equities weighs in favor of staying enforcement of the Statute for the Targeted Products.  Such a status-quo-preserving injunction is a routine exercise of the Court's equitable authority.  The Eighth Circuit "has repeatedly recognized that the purpose of injunctive relief is to preserve the status quo; it is not to give the movant the ultimate relief he seeks." *Lindell v. United States*, 82 F.4th 614, 618 (8th Cir. 2023) (considering a

motion for a preliminary injunction based on alleged constitutional violations); *see Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 490 (8th Cir. 1993) (reiterating the primary function of a preliminary injunction is to preserve the status quo until the merits and appropriate relief can be determined); *see also, e.g.*, *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006) (noting that "[t]he typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits."); *Hazardous Waste Treatment Council v. State of S.C.*, 945 F.2d 781, 788 (4th Cir. 1991) ("The rationale behind a grant of a preliminary injunction has been explained as preserving the status quo so that a court can render a meaningful decision after a trial on the merits.").

The injunction sought here is just such an effort to preserve the status quo. While the State undoubtedly has an interest in enforcing its laws, there is little harm from a temporary restoration of the prevailing state of affairs that was in place mere days ago. Delaying prohibition of the Targeted Products will not meaningfully harm either the State or its citizens. As discussed at length above, the cookware ban targets products that pose no risk to the health and well-being of Minnesota consumers. On the other hand, Plaintiff's members will suffer substantial and irreparable harm if the law is allowed to continue in effect. In particular, the law must be stayed during the pendency of this action, because the loss of goodwill and market share is ongoing now that CSA members' products are no longer on shelves in Minnesota. Thus, if the Court declines to issue the preliminary injunction, the damage will be done in the interim, even if Plaintiff is ultimately successful in demonstrating that the statute is unconstitutional (which, as noted above, is likely).

Similarly, consideration of the public interest supports the limited injunction. As demonstrated above, the Statute violates the Federal Constitution in two independently sufficient ways. There is no public interest in the enforcement of unconstitutional laws; to the contrary, the public interest lies in the enforcement of the Constitution and the federal prerogatives guarded by the Dormant Commerce Clause. *See, e.g.*, *Pavek*, 467 F. Supp. 3d at 762 (finding State of Minnesota would "not suffer at all" from preliminary injunction because "a State has no interest in enforcing laws that are unconstitutional and an injunction preventing the State from enforcing the challenged statute does not irreparably harm the State"); *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020) ("No public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal."); *Little Rock Fam. Plan. Servs. v. Rutledge*, 397 F. Supp. 3d 1213, 1322 (E.D. Ark. 2019) ("[A] State has no interest in enforcing laws that are unconstitutional ... an injunction preventing the State from enforcing [the challenged statute] does not irreparably harm the State.") (*citing Hispanic Interest Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1249 (11th Cir. 2012)); *Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 813 (E.D. Mich. 2021). Moreover, there is zero public interest in banning sales of the Targeted Products because, as described thoroughly above, these products pose no health risk to the public.

## CONCLUSION

Each of the traditional equitable factors supports enjoining the Statute. Plaintiff is highly likely to succeed on the merits of its constitutional claims under the Dormant Commerce Clause. Plaintiff and its member companies face an imminent risk of mounting

35

irreparable harm from enforcement of the Statute and their brands' exclusion from the Minnesota market. And both the balance of the equities and the public interest uniformly favor a temporary injunction to extend the pre-January 1st status quo while these serious constitutional claims are resolved. Consequently, and for the reasons stated above, Plaintiff respectfully urges the Court to enter an Order enjoining the enforcement of the Statute, as applied to the Targeted Products, during the pendency of this action.

Dated: January 7, 2025                    Respectfully Submitted,

                                          **COZEN O'CONNOR**

                                          /s/ *Cassandra M. Jacobsen*
                                          Cassandra M. Jacobsen (#0400120)
                                          cjacobsen@cozen.com
                                          33 South 6th Street, Suite 3800
                                          Minneapolis, MN 55402
                                          (612) 260-9000 | Telephone
                                          (612) 260-9080 | Facsimile

                                          Stephen Miller (PA 308590)
                                          (*pro hac* forthcoming)
                                          Andrew Linz (PA 324808)
                                          (*pro hac* forthcoming)
                                          1650 Market Street, Suite 2800
                                          Philadelphia, PA  19103
                                          (215) 665-2000 | Telephone
                                          (215) 665-2013 | Facsimile