UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

COOKWARE SUSTAINABILITY ALLIANCE,

                              Plaintiff,

                              Civil No. 25-41 (JRT/DTS)

v.

KATRINA KESSLER, *Commissioner, Minnesota Pollution Control Agency, in her official capacity*,

                              MEMORANDUM OPINION AND ORDER
                              DENYING MOTION FOR PRELIMINARY
                              INJUNCTION

                              Defendant.

Andrew Linz and Stephen Aaron Miller, **COZEN O'CONNOR**, 1650 Market Street, Suite 2800, Philadelphia, PA 19103; Cassandra Jacobsen, **COZEN O'CONNOR**, 33 South Sixth Street, Suite 3800, Minneapolis, MN 55402, for Plaintiff.

Emily Beth Anderson and Oliver J. Larson, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 1400, Saint Paul, MN 55101, for Defendant.

In 2023, the Minnesota legislature passed "Amara's Law" to ban the use of PFAS in a variety of products sold in Minnesota—including cookware. That ban took effect on January 1, 2025. Now, industry group Plaintiff Cookware Sustainability Alliance ("CSA") brings this action to enjoin enforcement of that ban, arguing that the outright ban on producing nonstick cookware with PFAS violates the dormant Commerce Clause and that its future requirement to report PFAS products to the Minnesota Pollution Control Agency violates CSA's rights under the First Amendment and the Supremacy Clause. CSA now

moves for a preliminary injunction on the PFAS ban in cookware. Because the Court finds that the *Dataphase* factors do not favor issuing a preliminary injunction, the Court will deny the motion.

**BACKGROUND**

**I.   FACTS**

In 2023, The Minnesota Legislature passed "Amara's Law," Minnesota Session Law – 2023, Chapter 60, Article 3, Section 21, codified as Minn. Stat. § 116.943 (the "Statute"), banning the sale or distribution of cookware products containing intentionally added per- and poly-fluoroalkyl substances (or "PFAS"). (Compl. ¶ 1, Jan. 6, 2025, Docket No. 1.) The Statute defines PFAS as "a class of fluorinated organic chemicals containing at least one fully fluorinated carbon atom." (*Id.* ¶ 48.) The goal of the Statute is to protect Minnesotans from dangerous chemicals applied to nonstick cookware. (*Id.* ¶ 3.) Minnesota Governor Tim Walz signed the bill into law on May 19, 2023, and the Statute went into effect January 1, 2025. (*Id.* ¶ 45.) Beginning January 1, 2026, the Statute will additionally require manufacturers to submit product information to the State whenever a new product containing intentionally added PFAS is sold, offered for sale, or distributed in Minnesota. (*Id.* ¶¶ 49–50.) Product information subject to disclosure includes a brief description of the product, the purpose for added PFAS, the amount of added PFAS to the cookware, and the name and address of the manufacturer. (*Id.* ¶ 49.)

CSA is a non-profit business league organization dedicated to educating consumers and policy makers about the safety of cookware products. (*Id.* ¶ 13.) Its members include

leading cookware manufacturers, all of which are located outside the state of Minnesota. (*Id.* ¶¶ 14, 39.) One cookware manufacturer, Nordic Ware, is located in Minnesota, but Nordic Ware ceased producing cookware products containing PFAS in 2024 in response to Amara's Law coming into effect. (*Id.* ¶¶ 40–41, 43.)

The cookware industry categorizes its products into two main groups: Nonstick Products and Other Products. (*Id.* ¶ 22.) Three available technologies exist to create the nonstick coating: (1) fluoropolymer nonstick; (2) sol-gel; and (3) silicone-based nonstick. (*Id.* ¶ 24.) The most common fluoropolymer compounds used to create the nonstick feature are polytetrafluoroethylene ("PTFE"), fluorinated ethylene propylene ("FEP"), and perfluoroalkoxy alkane ("PFA"). (*Id.* ¶¶ 28–29.) PTFE, FEP, and PFA are all fluoropolymers that include "at least one fully fluorinated carbon atom." (*Id.* ¶ 55.) PTFE- and FEP-based fluoropolymer nonstick cookware has been FDA-approved as safe for human use and consumption since 1962, and the PFA-based fluoropolymer nonstick cookware has similarly been FDA-approved since 1982. (*Id.* ¶ 65.)

In 2023, Nonstick Products represented 62.6% of the United States' cookware market, while Other Products represented 37.4%. (*Id.* ¶ 35.) CSA's members supplied approximately 47% of the fluoropolymer nonstick products sold in the United States in a one-year period ending in September 2024, and approximately 57% of the fluoropolymer nonstick products sold in Minnesota during that same period. (*Id.* ¶ 38.) CSA reports that

Minnesota retailers began cancelling orders with CSA's members in advance of the Statute going into effect. (*Id.* ¶ 58.)

The Commissioner of the Minnesota Pollution Control Agency (the "Commissioner") is authorized by the Statute to enforce and investigate violations. (*Id.* ¶ 16.) If a violation occurs, the Statute authorizes a court to criminally prosecute up to a misdemeanor and impose a civil penalty up to $15,000 per day per violation. (*Id.* ¶ 52.)

## II.     PROCEDURAL HISTORY

CSA commenced this action on January 6, 2025, by filing a complaint seeking declaratory and injunctive relief against Katrina Kessler, in her official capacity as Commissioner of the Minnesota Pollution Control Agency. (*Id.* ¶ 1.) CSA alleges that the Statute violates the Commerce Clause, the First Amendment, and the Supremacy Clause of the U.S. Constitution. (*Id.* ¶¶ 119, 129, 131, 138–39.) CSA moved for a preliminary injunction on January 7, 2025, claiming ongoing and irreparable harm caused by the Statute's imminent ban on the sale or distribution of cookware products containing intentionally added PFAS in Minnesota.[1] (Pl.'s Mem. Supp. Mot. Prelim. Inj. at 1–2, Docket No. 12.)

---

[1] The preliminary injunction motion does not ask for relief as to the First Amendment and Supremacy Clause claims at this time, presumably because the Statute's disclosure provisions do not kick in until 2026.

**DISCUSSION**

I.   **STANDARD OF REVIEW**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  The Court must consider four factors in determining whether to grant preliminary injunctive relief: (1) the probability that the moving party will succeed on the merits, (2) the threat of irreparable harm to the moving party, (3) the balance of harms as between the parties, and (4) the public interest. *S.J.W. ex rel. Wilson v. Lee's Summit R–7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)).  "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113.  The party requesting injunctive relief bears the complete burden for showing the above factors.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

II.   **ANALYSIS**

   A.   **Likelihood of Success**

The Court's most important duty in a preliminary injunction analysis is to decide whether the plaintiff is likely to succeed on the merits.  *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1342 (8th Cir. 2024) ("While no single factor is determinative, the probability of success factor is the most significant.").  When a movant seeks to enjoin a duly enacted state statute, the court must "make a threshold finding that a party is likely to prevail on

the merits." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc) (noting that preliminary injunctions of state statutes are subject to a "more rigorous standard" than the familiar "fair chance of prevailing" standard in other cases).

CSA brings its claim against Amara's Law under the dormant Commerce Clause. The Commerce Clause grants Congress the power to regulate interstate commerce. U.S. Const. art. I, § 8, cl. 3. The Commerce Clause "has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*, 511 U.S. 93, 98 (1994); *see also S. Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 592 (8th Cir. 2003) ("The dormant Commerce Clause is the negative implication of the Commerce Clause: states may not enact laws that discriminate against or unduly burden interstate commerce."). At its core, the dormant Commerce Clause caselaw is meant to curtail "state protectionism." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 515 (2019); *Entergy Ark., LLC v. Webb*, 122 F.4th 705, 710 (8th Cir. 2024) ("The dormant Commerce Clause prohibits the enforcement of state laws driven by economic protectionism.").

CSA may proceed with a dormant Commerce Clause case in two ways. The easier path to a victory comes when the law "mandate[s] 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'"

*Granholm v. Heald*, 544 U.S. 460, 472 (2005) (quoting *Or. Waste Sys.*, 511 U.S. at 99).  In such a case of overt discrimination—either in purpose or in effect—the state law must survive strict scrutiny.  *Entergy Ark.*, 122 F.4th at 711.

But absent discrimination, a state law will only be struck down under the dormant Commerce Clause if it "impos[es] a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits.'"  *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

CSA alleges both flavors of a dormant Commerce Clause case, but neither are likely to succeed.

### 1. Discrimination Against Out-of-State Interests

CSA alleges that Amara's Law discriminates against out-of-state interests because it only applies to out-of-state manufacturers.

CSA consists of three leading cookware manufacturers: Meyer Corporation U.S., Groupe SEB, and Tramontina.  (Compl. ¶ 14.)  All three are headquartered outside Minnesota, and all three admittedly manufacture cookware that contains PFAS.  (*Id.*)  Together, CSA members supply approximately 47% of the fluoropolymer nonstick products sold in the United States and 57% of the fluoropolymer nonstick products sold in Minnesota.  (*Id.* ¶ 38.)  Only one cookware manufacturer, Nordic Ware, is located in Minnesota; however, in 2024, shortly after Amara's Law was signed into law, Nordic Ware discontinued its line of cookware products that contained PFAS.  (*Id.* ¶¶ 40–43.)  As a

result, 100% of the fluoropolymer nonstick products in the global market are now manufactured outside Minnesota. (*Id.* ¶ 44.)

As a threshold matter, CSA does not seem to argue that the Statute was passed with the intent to discriminate against out-of-state entities. Nor could it. Indeed, the legislative history of Amara's Law suggests exactly the opposite: that legislators chose to protect Minnesotans from the potential dangers of PFAS contamination **despite** its disproportionate effect on in-state industry. Bill sponsor Senator Judy Seeberger noted that PFAS "originated here, and I believe we have a duty to lead the charge in their eradication"; Representative Sydney Jordan concurred, stating, "Minnesota invented PFAS. By passing this, Minnesota is going to invent the solution and end this harm caused by forever chemicals."[2]

Conceding the Statute does not facially discriminate against out-of-state manufacturers, CSA instead argues the law is discriminatory in effect because it only applies to out-of-state manufacturers. But that's wrong. When Amara's Law was signed into law, at least one manufacturer in Minnesota, Nordic Ware, used PFAS in its cookware. Rather than fighting the Statute in court, Nordic Ware chose to comply and eventually ceased production of PFAS-laden cookware in 2024. But that does not mean the Statute no longer applies to Nordic Ware—Amara's Law applies to Nordic Ware as much today as

---

[2] Press Conference: Banning Products Containing PFAS, May 9, 2023, Minnesota Senate Media Services, available at https://www.youtube.com/watch?v=bZKxlVf5AHg at 5:30 & 19:56.

it did the day before the company ceased producing such cookware, because Nordic Ware is prevented from renewing that particular line of cookware. Choosing to comply with a law does not relieve one from the burden of the law. Here, there simply is no discrimination—either on its face or in effect—against out-of-state manufacturers.

Indeed, even if there had never been any in-state manufacturers located within Minnesota, a state may still prohibit the sale of products manufactured 100% outside the state, so long as the purpose is not to give a competitive advantage to an in-state entity. *See Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 125 (1978) (upholding a gas regulation that had a 100% disparate impact on out-of-state producers because it simply preferred one type of gas over another). That makes sense, because to hold otherwise would mean Minnesota could effectively never regulate any product (like, say, asbestos) if it just so happens that every manufacturer of the product is located out of state.

Overall, though CSA is of course free to dispute the relative merits of Amara's Law, the Statute simply does not reek of economic protectionism. CSA is highly unlikely to succeed on an overt discrimination-based claim under the dormant Commerce Clause.

### 2. Undue Burden on Interstate Commerce

That leaves undue burden on interstate commerce as the only viable path to a dormant Commerce Clause claim.

Absent discrimination, a state generally retains the power to "exclude from its territory, or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to the interests of its citizens." *Nat'l Pork Producers Council v. Ross*, 598

U.S. 356, 369 (2023) (quotation omitted). However, a state law still violates the dormant Commerce Clause if the plaintiff proves that the law substantially burdens interstate commerce, and those burdens clearly outweigh its benefits. *See id.* at 383–84; *Entergy Ark.*, 122 F.4th at 711. The Court must conduct a *Pike* balancing analysis under this version of a dormant Commerce Clause claim: "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.

CSA's primary argument is that Minnesota is single-handedly regulating the entire cookware industry by banning PFAS in cookware manufacturing. The alleged "substantial burden" is that the industry must either comply with the Statute by significantly changing their product lines or else exit the Minnesota market altogether. CSA also minimizes the actual benefits Amara's Law imbues because it claims its products "pose no health or safety risk" to Minnesotans because the kind of PFAS used in cookware cannot be absorbed into the body in the same way others can. (*See* Compl. ¶¶ 63, 94, 117.)

But the legislators who passed Amara's Law clearly disagree. The Commissioner argues that the science proffered by CSA is murky at best as it relates to the effect of PFAS-laden cookware on the human body and, even setting that aside, notes that part of the impetus for passing the Statute was PFAS's overall environmental effects in Minnesota as consumers discard PFAS-laden cookware in Minnesota landfills.

Successful challenges to neutral state laws under the dormant Commerce Clause are quite rare. *Truesdell v. Friedlander*, 80 F.4th 762, 773 (6th Cir. 2023) (noting the Supreme Court has not invalidated a law under *Pike* in over thirty years). And in *Pork Producers*, the Supreme Court seems to have narrowed the range of cases that would survive a *Pike* analysis, anyway, in a few important ways relevant to this case.

First, the *Pork Producers* controlling plurality clarified that courts should not even bother assessing the local benefits of a law unless the burden on interstate commerce (not individual businesses) is substantial. 598 U.S. at 383. And though CSA members may well have to exit the Minnesota market (or simply sell cookware without PFAS), the Commerce Clause does not guarantee any "particular structure or methods of operation in a retail market." *Exxon Corp.*, 437 U.S. at 127.

Second, *Pork Producers* makes clear that any "costs ultimately borne by in-state consumers thanks to a law they adopted" is not a cognizable harm and is not to be considered in the *Pike* balancing test. 598 U.S. at 386. Though CSA recharacterizes the burden here as one on the manufacturers, the largest burden is likely to be faced by Minnesota consumers themselves, who will no longer have access to nonstick cookware that contains PFAS. But Minnesotans elected legislators who evaluated the science in front of them and chose to sacrifice those options for the overall health of the State. That was their choice to make, and it cannot be used to breathe life into a dormant Commerce

Clause claim. In contrast, CSA will need only to carve one state out of its fifty-state domestic market to continue doing business.

Finally, *Pork Producers* clarified that the two traditional paths to proving a dormant Commerce Clause claim—overt discrimination and undue burden on interstate commerce—represent more of a spectrum than a dichotomy. That is, if plaintiffs cannot prove a law is discriminatory, they do not begin their undue burden claim with an "auspicious start," and their burden becomes much heavier under the *Pike* balancing test. *Id.* at 379–80. Here, nothing about Amara's Law suggests it has the purpose or effect of discriminating against out-of-state manufacturers, and it simply does not bring to mind the kind of economic protectionism the Commerce Clause was meant to curtail. CSA has shown no such discrimination or economic protectionism, so its undue burden claim must be stronger still.

Overall, the standard for finding a dormant Commerce Clause violation via this second path is a remarkably tough one for a plaintiff, and CSA here has not adequately shown that the Statute's well-documented environmental and health benefits are clearly outweighed by the law's burden on manufacturers. Amara's Law is not discriminatory in purpose nor in effect. And though there may be some burden on individual businesses, the overall effect on interstate commerce is not a substantial one, nor is it clearly excessive compared to the potential health and environmental benefits Amara's Law professes to provide Minnesotans.

CSA's likelihood of success on a dormant Commerce Clause claim is highly unlikely. That alone is nearly enough to stop a preliminary injunction from issuing, but the Court will briefly analyze the other factors, as well.

**B.     Irreparable Harm**

The Court must also assess "the threat of irreparable harm" to CSA. *Dataphase*, 640 F.2d at 113.

Here, though CSA concedes that monetary damages typically do not rise to the level of irreparable harm, CSA argues enforcement of the law will lead to injury to its members' reputations, consumer goodwill, and brand loyalty. *See Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) (finding district court did not clearly err in finding irreparable harm to reputation and goodwill). In essence, CSA seems to claim that its inability to sell cookware with PFAS in the short-term will lead to consumers switching to competitors' brands or to consumers being forced to buy CSA members' less-popular ceramic wares that do not contain PFAS.

But those arguments collapse in on each other. No manufacturer will be allowed under the Statute to sell nonstick cookware that contains PFAS. It then does not follow that a consumer wishing to buy nonstick cookware will switch to competitors, which themselves also cannot sell PFAS-laden nonstick cookware. And if consumers are forced to purchase supposedly less-popular ceramic wares (from CSA members or elsewhere), that burden is felt equally across the industry, not merely on CSA members.

The Court does not wholly discount the possible short-term harm to CSA members, which will certainly need to either change the composition of its products for Minnesota consumers or exit the market completely. But the harm is hardly irreparable.

Therefore, this factor does not strongly point in favor of issuing injunctive relief and is a neutral one at best.

### C. Balance of the Harms and Public Interest

"The third and fourth factors for a preliminary injunction—harm to the opposing party and the public interest—merge when the Government is the party opposing the preliminary injunction." *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1018 (8th Cir. 2023).

The harm to CSA has already been discussed above, but the Commissioner and the public would be harmed by the disruption of the enforcement of a law meant to protect Minnesotans from PFAS contamination. CSA casts its request for a preliminary injunction as a preservation of the status quo. However, the part of the Statute banning PFAS in cookware went into effect on January 1, 2025. Despite the Statute being signed in May 2023, CSA waited over eighteen months—until the law was already in place—to file suit and ask for a preliminary injunction. Therefore, the effect of a preliminary injunction now is not to maintain the status quo. It is to upend it. A preliminary injunction would now overturn a law that was passed by the Minnesota legislature and signed by the Governor to protect its citizens from the harmful effects of PFAS.

-15-

The Court is reluctant to wade into the scientific debate about which would be more harmful—PFAS on the one hand, and economic damages to industry on the other. But because the Statute is already in effect without cataclysmic disruption of the industry, and because the legislature has already determined it is in the best interest of the public to protect Minnesotans from PFAS in cookware, the Court finds that the balance of the harms and the public interest do not weigh in favor of issuing an injunction here.

## CONCLUSION

Perhaps more than any state in the union, Minnesota knows the dangers of PFAS. Responding to that potent local concern, Minnesota's elected representatives passed one of the strictest laws in the country to protect Minnesotans from PFAS contamination. CSA, a cookware industry group, brings this motion to preliminarily enjoin enforcement of that law under the dormant Commerce Clause. But because the law does not discriminate against out-of-state interests and its burden on interstate commerce is not clearly excessive in relation to the local benefits Minnesotans would enjoy, CSA is unlikely to succeed on the merits of its dormant Commerce Clause claim. Any harm to CSA here, while not nonexistent, is not so substantial to be irreparable, and the balance of the harms and public interest do not weigh in favor of issuing a preliminary injunction. Accordingly, the Court will deny CSA's motion for a preliminary injunction.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Preliminary Injunction [Docket No. 10] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: February 25, 2025
at Minneapolis, Minnesota.

*John R. Tunheim*
JOHN R. TUNHEIM
United States District Judge