UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Cookware Sustainability Alliance,                    Case File No. 25-CV-0041-JRT-DTS

          Plaintiff,

    vs.

                                    **DEFENDANT'S MEMORANDUM**
Katrina Kessler, Commissioner,                  **OF LAW IN SUPPORT OF**
Minnesota Pollution Control Agency,           **MOTION TO DISMISS**
in her official capacity,

          Defendant.

## INTRODUCTION

In our federalist system of government, it is a quintessential police power of state government to regulate what is sold within that state. *See, e.g., Guy v. Baltimore*, 100 U.S. 434, 443 (1879). Minnesota did just that in 2023, when it passed a law that prohibits the in-state sale of most products that contain PFAS over concerns about PFAS's effects on human health and the environment – concerns that are particularly well-documented in this State. The Cookware Sustainability Alliance sues to invalidate that law, claiming that Minnesota's product regulation crosses constitutional bounds or is preempted by federal law.

The Alliance is wrong. First, its claims under the dormant Commerce Clause fail because Minnesota's PFAS ban does not discriminate against or unduly burden interstate commerce. Second, the Alliance attempts to challenge a disclosure requirement that does

1

not apply to it or any of its members; so the Alliance does not have standing to challenge it. Third, even setting aside that justiciability issue, a fact-based disclosure to regulators does not run afoul of the First Amendment. And fourth, the Defend Trade Secrets Act does not apply to state government's activities, so it does not preempt a state disclosure requirement. In short, the Alliance's entire suit fails as a matter of law and should be dismissed under Rule 12(b)(6).

## FACTUAL BACKGROUND[1]

### I. PFAS CHEMICALS.

Per- and polyfluoroalkyl substances – or PFAS – are a family of thousands of human-made chemicals that tend to be heat, water, and oil-resistant, insulating, and lubricating. Doc. 1 ¶¶ 28, 48; Minn. Stat. § 116.943, subd. 1(p); Minnesota's PFAS Blueprint (PFAS Blueprint), February 2021[2], at 4. Because of these properties, PFAS appear in many consumer products, including products that people use and interact with

---

[1] For the purposes of this motion, the Commissioner treats plaintiff's well-pleaded factual allegations as true (as she must), but the Commissioner does not concede those allegations are actually true. *Brown v. Medtronic, Inc.*, 628 F.3d 451, 459 (8th Cir. 2010).

[2] Available at https://www.pca.state.mn.us/sites/default/files/p-gen1-22.pdf (last accessed Jan. 21, 2025). The Court may take judicial notice of the PFAS Blueprint as a public record that reflects the policy and positions of Minnesota's government, as well as for basic facts about PFAS in Minnesota that cannot be reasonably disputed. *See United States v. Eagleboy*, 200 F.3d 1137, 1140 (8th Cir. 1999); *see also Gent v. Cuna Mut. Ins. Soc'y,* 611 F.3d 79, 84 n. 5 (1st Cir.2010) (taking judicial notice of information about Lyme disease taken from website of Center for Disease Control and Prevention); *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir.2011) (district court appropriately took judicial notice of documents and transcripts produced by Food and Drug Administration, and available to public); *Or. Natural Desert Ass'n v. BLM*, 625 F .3d 1092, 1112, n. 14 (9th Cir.2010) (taking judicial notice of public documents, including 2005 BLM Handbook, along with BLM briefs in other courts not in the record).

2

every day, such as cookware, cosmetics, fast food wrappers, carpets, and clothing. PFAS Blueprint at 6-8; Doc. 1, ¶ 70. PFAS also are incredibly stable – making them desirable to manufacturers, because they are very long-lasting. But this same property also means that PFAS do not readily break down over time in environmental conditions. PFAS Blueprint at 4. PFAS also "bioaccumulate" – which means they build up over time in living organisms, including humans. *Id.* at 1. In addition, PFAS are not easily removed from products through conventional pollution treatment at facilities like wastewater treatment plants. *Id.* As a result, PFAS are often referred to as "forever chemicals" because they stay in the environment indefinitely. *Id.*

While some of the most-well studied and oldest PFAS formulations have been phased out of American manufacturing, it is no secret that companies continue to develop new replacement PFAS. *Id.* at 6; Doc. 1 ¶¶ 66-70. Because there are currently no requirements to label or disclose PFAS in products, it is impossible to know how many products contain PFAS, and current scientific testing may not be identifying the presence of newer developed PFAS in either products or the environment. PFAS Blueprint at 8, 31[3]; *see also* Doc. 1 ¶¶ 105-106 (noting that Alliance members attempt to keep the chemical makeup of their products a secret).

---

[3] *See also* Kaylie Ian Kirkwood, "Advancing Analytical Techniques to Investigate Per- and Polyfluoroalkyl Substances (PFAS) Exposure and Metabolic Impacts," at 1, Mar. 23, 2023. Available at https://repository.lib.ncsu.edu/items/626ebaed-3efd-4a1f-9fb8-36364e65dff1 (last accessed Jan. 21, 2025).

PFAS are also associated with a wide range of human health effects, from higher cholesterol to changes in liver function to immune suppression to cancer. "PFAS and Health," Minnesota Department of Health, updated Nov. 20, 2024.[4] But there are significant gaps in this research, and scientists have limited ability to draw conclusions about the amount of most PFAS that could cause adverse health outcomes over an individual's lifetime. PFAS Blueprint at 9.

## II.    MINNESOTA PASSES AMARA'S LAW.

Minnesota has a long history with PFAS. For decades, the company 3M in Minnesota was a primary manufacturer of PFAS. PFAS Blueprint at 6. In 2002, 3M alerted the Minnesota Pollution Control Agency (MPCA) of PFAS in its production and drinking water wells in Cottage Grove, Minnesota. *Id.* at 10. As a result of a settled lawsuit springing from this pollution, 3M agreed to pay $850 million to be used for safe and sustainable drinking water and natural resource projects in Minnesota. *Id.* at 10-11.

PFAS have been detected all over in Minnesota – in water, sediment, soil, and fish. Minnesota's PFAS Blueprint Summary, at 1.[5] And PFAS's presence in Minnesota is no longer solely tied to 3M's waste disposal practices – it is much broader. PFAS Blueprint at 11.

_____

[4]Available                                                                                              at https://www.health.state.mn.us/communities/environment/hazardous/topics/pfashealth.html (last accessed Jan. 21, 2025). This, too, the Court can take judicial notice of – it is a public record of the Minnesota Department of Health, a government agency, regarding its activities, research, and concerns. *Supra* at fn. 2.
[5]Available at https://www.pca.state.mn.us/sites/default/files/p-gen1-22g.pdf (last accessed Jan. 21, 2025).

As a result of this history, in 2023, Minnesota passed sweeping legislation to prohibit products containing PFAS from being sold in Minnesota (called "Amara's Law" after a young advocate). Minn. Laws 2023, ch. 60, art. 3, § 21; Minn. Stat. § 116.943; Doc. 1, ¶ 1. Beginning January 1, 2025, Amara's Law prohibits anyone from selling 11 categories of products that contain intentionally added PFAS in Minnesota. Minn. Stat. § 116.9432, subd. 5(a); Doc. 1, ¶ 1. By 2032, Amara's Law will prohibit anyone from selling any product containing intentionally added PFAS in Minnesota, unless the Commissioner uses rulemaking to carve a specific product or category of products out of the ban as a "currently unavoidable use" of PFAS. Minn. Stat. § 116.943, subd. 5(c).[6]

In addition, Amara's Law requires manufacturers of PFAS-containing products that continue to be sold in Minnesota to submit to MPCA's Commissioner information about those products (what the Alliance calls the "disclosure requirement"). Doc. 1 ¶ 84; Minn. Stat. § 116.943, subd. 2. That information is due to the Commissioner by January 1, 2026. Minn Stat. § 116.943, subd. 2(a). If a manufacturer fails to do so, the manufacturer is prohibited from selling that product in Minnesota. *Id.*, subd. 2(d).

Finally, as relevant here, Amara's Law allows MPCA's Commissioner to require product testing if she has reason to believe that a product sold in Minnesota *does* contain PFAS, even though the product is banned under subdivision 5 or if the manufacturer has not disclosed it so it is banned under subdivision 2. Doc. 1, ¶ 51; Minn. Stat. § 116.943,

---

[6] Notably, the statute prohibits MPCA's Commissioner from using rulemaking authority to allow the continued sale of any of paragraph (a)'s 11 product categories, including cookware, as an unavoidable use. Minn. Stat. § 116.943, subd. 5(c).

subd. 4. In short, subdivision 4 provides the Commissioner with a tool to sniff out ongoing violations of Amara's Law. *See* Doc. 1, ¶ 51. If the result of Commissioner-ordered testing reveals PFAS, the manufacturer must disclose that to the Commissioner, comply with subdivision 2's disclosure requirement, and notify retailers that the product is banned. Minn. Stat. § 116.943, subd. 4(c)-(d). The Commissioner may also notify retailers of that same information. *Id.*, subd. 4(e). If the Commissioner-ordered testing does not reveal PFAS (and accordingly shows no violation of Amara's Law), the manufacturer must only provide the Commissioner a certificate attesting to that fact (along with the test results). *Id.*, subd. 4(b).

## III.    THIS LAWSUIT.

On January 6, 2025 – after the first round of Amara's Law's product prohibitions, including cookware, went into effect – the Cookware Sustainability Alliance sued MPCA's Commissioner to enjoin Amara's Law. Doc. 1. The Alliance is a non-profit business league made up of cookware manufacturers, all of which are located outside of Minnesota. *Id.,* ¶¶ 13-14, 39. The Alliance's members make cookware that contain PFAS as their primary business (though all members also make cookware that does not contain PFAS). *Id.* ¶¶ 37-38. The Alliance alleges its members supplied most of the PFAS-containing cookware sold in Minnesota last year. *Id.* ¶ 38.

The Alliance concedes that Amara's Law currently prohibits its members from selling cookware containing PFAS in Minnesota. *Id.* ¶ 56. It alleges that prohibition will cause its members to suffer substantial economic injury. *Id.* ¶ 57. Minnesota retailers have canceled orders for Alliance members' PFAS-containing cookware. *Id.* ¶ 58. And the

Alliance alleges that its members cannot easily or cheaply switch their manufacturing processes to make more cookware that does not contain PFAS. *Id.* ¶¶ 33-34. All told, the Alliance claims its members will be substantially burdened by Amara's Law, either because of lost sales or the cost of changing manufacturing processes or both. *Id.* ¶ 59.

In addition, the Alliance alleges that there are no current manufacturers of cookware containing PFAS located in Minnesota. *Id.* ¶ 44. Nordic Ware is the only major cookware manufacturer in Minnesota, and it discontinued producing cookware with PFAS in 2024 in response to Amara's Law. *Id.* ¶¶ 40-43.

The Alliance claims that Amara's Law violates the dormant Commerce Clause, both by discriminating against out-of-state commerce and by placing an undue burden on interstate commerce that is excessive to any local benefit. *E.g., id.* ¶¶ 113-119, 122-129. And though the Alliance acknowledges that its members are not required to make Amara's Law's product disclosure because they cannot sell their products in Minnesota, *id.* at ¶ 49, n.4, the Alliance claims that Amara's Law's disclosure requirement runs afoul of the First Amendment's protection against compelled speech and is preempted by the federal Defend Trade Secrets Act. *Id.* ¶¶ 131, 137-139.

## LEGAL STANDARD

Rule 12(b)(6) eliminates actions that are fatally flawed in their legal premises, "streamlin[ing] litigation by dispensing with needless discovery and fact finding." *Neitzke v. Williams,* 490 U.S. 319, 326-27 (1989). In reviewing a complaint under a Rule 12(b)(6) motion to dismiss, the Court considers all facts alleged in the complaint as true and construes the pleadings in a light most favorable to the non-moving party. *See*

*Brotherhood of Maint. of Way Emp. v. Burlington N. Santa Fe R.R.,* 270 F.3d 637, 638 (8th Cir. 2001).

However, to avoid dismissal, a complaint must provide more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)); *see also DuBois v. Ford Motor Credit Co.*, 276 F.3d 1019, 1022 (8th Cir. 2002) ("[A] complaint must contain sufficient facts, as opposed to mere conclusions, to satisfy the legal requirements of the claim[s.]"). The Court is "not required to divine the litigant's intent and create claims that are not clearly raised, and it need not conjure up unpled allegations to save a complaint." *Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 796 (8th Cir. 2021) (quoting *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009)). Similarly, "the court is free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations." *Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002).

## ARGUMENT

None of the Alliance's claims are legally viable. Amara's Law neutrally regulates product sales within Minnesota, treating in-state sellers and out-of-state sellers the same. Nor are its effects on interstate commerce substantial, much less excessive in relation to the Law's benefits – protecting Minnesotans and Minnesota's environment from PFAS contamination. The dormant Commerce Clause does not prohibit that sort of even-handed regulation. Moreover, the Alliance affirmatively pleads that its members are not subject to Amara's Law's disclosure requirement, so the Alliance does not have standing to challenge

that requirement. In any case, the disclosure requirement does not violate the First Amendment and is not preempted by a federal remedy for the misappropriation of trade secrets.

## I.    AMARA'S LAW DOES NOT VIOLATE THE DORMANT COMMERCE CLAUSE BECAUSE IT REGULATES NEUTRALLY (COUNTS I-II).

The Alliance's dormant Commerce Clause claims both fail as a matter of law. The "very core" of dormant Commerce Clause jurisprudence is the principle that states are free to prohibit the sale of products within their borders, but they must do so without discriminating against interstate commerce. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023). In other words, the dormant Commerce Clause is meant to prohibit state laws driven by "economic protectionism" – those designed to benefit in-state economic interests by burdening out-of-state competitors. *Id.*; *see also Truesdell v. Friedlander*, 80 F.4th 762, 764 (6th Cir. 2023) ("Under the modern approach to the dormant Commerce Clause, a law's validity largely depends on whether it discriminates against out-of-state businesses in favor of in-state ones."); *N.J. Staffing All. v. Fais*, 110 F.4th 201, 205-06 (3d Cir. 2024).

Modern case law provides two interconnected paths to invalidate a law on dormant Commerce Clause grounds: by alleging overt discrimination, and through what is referred to as the *Pike* undue burden analysis. *See, e.g., Entergy Ark., LLC v. Webb*, 122 F.4th 706, 711 (8th Cir. 2024) (citing *Pike v. Bruce Church, Inc.*, 897 U.S. 137, 142 (1970)). But the Supreme Court stressed in *National Pork Producers* that *Pike*'s burden-balancing is not clearly separate from the core antidiscrimination purpose of the dormant Commerce

Clause. 598 U.S. at 377-78. In other words, under either theory, it is protectionism that must take "center stage" in a dormant Commerce Clause analysis. *Id.* at 372.

### A.    Amara's Law Does Not Discriminate Against Interstate Commerce (Count I).

The two easiest ways for the Alliance to invalidate Amara's Law would be to allege that it facially or purposefully discriminates against interstate commerce. *LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018, 1026 (8th Cir. 2020) (quoting *U & I Sanitation v. City of Columbus*, 205 F.3d 1063, 1067 (8th Cir. 2000)). The Alliance does not do so, though, because neither would be plausible. On its face, Amara's Law applies equally to in-state and out-of-state sellers of products containing PFAS. Minn. Stat. § 116.942, subd. 6(a) (prohibiting "a person" from selling, offering for sale, or distributing for sale products containing PFAS in Minnesota).

And the Alliance does not point to any legislative history indicating Minnesota was motivated by a desire to discriminate against out-of-state cookware manufacturers when it passed Amara's Law. To the contrary, the authors of Amara's Law were clear that *in-state* activity was a major source of their concern. *See, e.g.*, Press Conference: Banning Products Containing PFAS, May 9, 2023, Minnesota Senate Media Services, comments of Senator Judy Seeberger (PFAS "originated here, and I believe we have a duty to lead the charge in their eradication.")[7]; Winter, D., "Lawmakers to name chemical ban 'Amara's Law' to honor 20-year-old cancer victim," Minnesota Reformer, May 9, 2023, ("Minnesota

---

[7] Available at https://www.youtube.com/watch?v=bZKxlVf5AHg.

10

invented PFAS. By passing this, Minnesota is going to invent the solution and end this harm caused by forever chemicals," quoting Representative Sydney Jordan).[8]

Instead, the Alliance claims that Amara's Law has a discriminatory *effect* because it only applies to cookware manufactured outside of Minnesota. *E.g.*, Doc. 1, ¶ 114. But as a legal matter, that claim fails for three reasons.

First, the Alliance affirmatively pleads that Amara's Law *does* burden in-state manufacturers of cookware. Nordic Ware – a Minnesota cookware manufacturer – previously manufactured cookware containing PFAS but stopped doing so after Amara's Law was passed (but before it went into effect). *Id.*, ¶ 43. And just as the Alliance's members are now prohibited from selling cookware containing PFAS in Minnesota, so is Nordic Ware. Choosing to comply with Amara's Law rather than litigate does not relieve Nordic Ware of the law's burden (which is the same burden imposed on the Alliance's out-of-state members).

Moreover, Amara's Law is not aimed at manufacturing, but the *sale* of products containing PFAS. Minn. Stat. § 116.943, subd. 5(a). So, by its plain terms, Amara's Law also burdens retailers who would otherwise sell cookware containing PFAS, including Minnesota-based retailers like Target.[9] To buy the Alliance's conclusion that Amara's Law has a discriminatory effect, the Court has to shut its eyes to the plain terms of the statute

---

[8] Available at https://minnesotareformer.com/2023/05/09/lawmakers-to-name-chemical-ban-amaras-law-to-honor-20-year-old-cancer-victim/.

[9] *See, e.g.,* https://www.target.com/p/t-fal-2pc-frying-pan-set-simply-cook-nonstick-cookware-black/-/A-10793231#lnk=sametab.

and its effect on Minnesota sellers.[10] The Alliance provides no logic behind its implicit request to treat the Alliance's manufacturer-sellers differently than (for example) retailer-sellers or cleaning product-manufacturer-sellers[11], and the Commissioner has found no caselaw to support the Court undertaking such a piecemeal analysis. In sum, the Alliance does not plausibly allege that Amara's Law has a discriminatory effect simply because Minnesota entities subject to its burdens have not sued over it.

The second reason the Alliance's discriminatory effect allegations fail as a matter of law is connected to the first: Laws that have disparate impacts on out-of-state businesses are not the same as those that have discriminatory effects on interstate commerce. *See Truesdell*, 80 F.4th at 771. The Supreme Court has long held that states retain the power to regulate markets that are primarily (or even exclusively) made up of out-of-state suppliers. For example, in *Exxon Corp. v. Governor of Maryland*, the Court considered a Maryland gas regulation that had a 100% disparate impact on out-of-state producers (because Maryland imported all its gas). 437 U.S. 117, 125 (1978). But the Court held that this 100% out-of-state impact did not prove a discriminatory effect on interstate commerce, because

---

[10] This logical fallacy is even more stark when you consider that the Alliance only takes issue with one of the 11 product categories that Amara's Law prohibits effective this year (or the fact that it bans almost all products containing PFAS effective 2032) – the Alliance surely cannot claim that Amara's Law's near-blanket prohibition does not affect Minnesota manufacturers, distributors, or retailers of that wide variety of products. *See* Minn. Stat. § 116.943, subd. 5(a), (c).

[11] For example, 3M, another Minnesota corporation subject to subdivision 5(a)'s prohibition because it sells products containing PFAS. *See* https://pfas.3m.com/pfas_uses.

there was no "competitive advantage" to in-state entities over out-of-state entities but to one type of gas producer over another. *Id.* at 126.

The same analysis holds true here. Amara's Law prohibits the sale of products that contain PFAS, regardless of whether they are manufactured or sold by in-state companies or out-of-state companies. Minn. Stat. § 116.943, subd. 5. The law simply favors cookware not containing PFAS over cookware that does – a product regulation well within Minnesota's authority to enact. *Nat'l Pork Producers*, 598 U.S. at 369 ("[A] State may exclude from its territory, or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to the interests of its citizens.") (cleaned up) (quoting *Guy v. Baltimore*, 100 U.S. at 443). Especially where the Alliance affirmatively pleads that its members manufacture both prohibited and non-prohibited cookware (Doc. 1 at ¶ 37) that does not amount to discrimination against interstate commerce, but a permissible product regulation that has some (arguably disparate[12]) impact on some out-of-state businesses.

Simply put, there is a level playing field in Minnesota for the sale of cookware. While the exclusion of PFAS cookware creates a market gap to be filled, in-state and out-of-state companies can compete with equal vigor in that gap. The Alliance members'

_____

[12] Again, given the breadth of Amara's Law's PFAS prohibition and its clear effects on in-state retailers and manufacturers of other products affected by the Law, even that fails Rule 12(b)(6)'s plausibility threshold.

preference to continue to compete with PFAS products is a not a dormant commerce clause concern.[13]

Third, the Alliance's argument would lead to absurd results. Many products are manufactured in a small number of locations, or only one. Asbestos, for example, is only mined in a few locations – none of which are in Minnesota. Under the Alliance's theory, Minnesota could not ban the sale of asbestos in Minnesota because it is only mined outside of Minnesota and a ban would therefore "discriminate" against out-of-state commerce.[14] That argument would produce absurd circular results that would prevent Minnesota from effectively banning almost *anything*. If, for example, Minnesota banned the manufacture of a product in Minnesota, the dormant Commerce Clause would then prevent Minnesota from also banning the importation and sale of the same product because all the production would have shifted to out-of-state. Under the Alliance's theory, the dormant Commerce Clause would require Minnesota to allow the importation of a product whose manufacture it had just banned. The reach of the dormant Commerce Clause is far more circumscribed.

Minnesota is entitled to regulate what is sold within its borders, including by prohibiting the sale of certain products; the dormant Commerce Clause does not have anything to say about disfavoring certain products or manufacturing practices. *Nat'l Pork*

_____

[13] The dormant Commerce Clause's purpose is analogous to antitrust laws, where federal courts have repeatedly emphasized that "antitrust laws were enacted for 'the protection of competition, not competitors.'" *See*, *e.g. Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990). Similarly, the dormant Commerce Clause exists to protect interstate commerce generally, not specific competitors.

[14] There are in-state manufactured alternatives to asbestos insulation, including PFAS-containing spray foam.

*Producers*, 598 U.S. at 369, 384 (quoting *Exxon*, 437 U.S. at 127-128)). Because Amara's Law is neutral on its face, its purpose, and its effect in prohibiting both in-state and out-of-state actors from selling products containing PFAS within Minnesota, the Alliance does not plausibly allege that it discriminates against interstate commerce.

### B. The Alliance Does Not Allege a Substantial Burden on Interstate Commerce That Is Clearly Excessive to Amara's Law's Health, Safety, and Environmental Benefits (Count II).

Because the dormant Commerce Clause is primarily concerned with antidiscrimination, a claim under the *Pike* analysis shifts the burden to a challenger to invalidate a nondiscriminatory law, and that burden is a tall order. *Nat'l Pork Producers*, 598 U.S. at 379-80; *Truesdell*, 80 F.4th at 773. In fact, the Supreme Court has not invalidated a law under *Pike* in over thirty years. *Truesdell*, 80 F.4th at 773. To sufficiently allege a plausible *Pike* claim under the dormant Commerce Clause, the Alliance must have alleged that Amara's Law's burden on interstate commerce is "clearly excessive" compared to its putative local benefits. *LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018, 1030 (8th Cir. 2020). The Alliance does not allege such a disproportionate burden on interstate commerce.

The Alliance's claims of burden are centered on their own members' lost sales or, alternatively, the cost of switching their manufacturing processes to make more non-PFAS nonstick cookware to sell in Minnesota. Doc. 1, ¶¶ 58-60; 122-123. But the *Pike* analysis

does not consider the burden on particular companies, but on interstate commerce itself.[15]

And nothing in Amara's Law's text nor the Alliance's allegations plausibly show a substantial burden on interstate commerce. *Nat'l Pork Producers*, 598 U.S. at 383 (a court need not assess local benefits unless the burden on interstate commerce is substantial). True, Alliance members are prohibited from selling cookware containing PFAS in Minnesota. But that is the same burden shared by every Minnesota seller of cookware (and other products containing PFAS). And nothing in Amara's Law burdens the flow of out-of-state cookware into Minnesota so long as that cookware does not contain PFAS: Le Creuset (a French-Belgian company) cookware and Lodge cast iron skillets (manufactured in Tennessee) and the Alliance's members' own ceramic nonstick cookware can flow freely into Minnesota. That a particular product cannot be sold in Minnesota is not a burden on interstate commerce, because the dormant Commerce Clause does not guarantee any "particular structure or methods of operation in a retail market." *Exxon Corp.*, 437 U.S. at 127.

Similarly, *Pork Producers* forecloses consideration of the Alliance's claims of burden related to exiting the Minnesota market. *See, e.g.,* Doc. 1, ¶ 128. That cost is

---

[15] The Alliance creates the boogeyman of the "interstate commerce effects" if all 50 states pass PFAS product bans. Doc. 1, ¶ 61. But once again, the Alliance confuses a burden on a particular product or manufacturing process with a burden on interstate commerce. *See Exxon Corp.*, 437 U.S. at 127. If every state banned cookware containing PFAS, then no PFAS cookware could be sold in America; but nothing would stop cookware *without* PFAS that was manufactured in Tennessee or Texas from being sold in Washington or Minnesota. It is the latter with which the dormant Commerce Clause is concerned. *See, e.g., Nat'l Pork Producers*, 598 U.S. at 384.

ultimately borne by Minnesota consumers (who are no longer able to buy cookware containing PFAS), thanks to a law *they* adopted. That is not a cognizable burden on interstate commerce. *Nat'l Pork Producers*, 598 U.S. at 386.

The burden the Alliance asserts, in other words, is no different (and indeed far less) than courts confronted in *Pork Producers* (which threatened a "'massive' disruption of the pork industry" and a potential exit from the California market, 598 U.S. at 382), or *Exxon* (which was predicted to cause a "change in the market structure," 437 U.S. at 127), or *LSP Transmission* (where only a burden that would "eliminate competition in the market completely" would constitute an undue burden, 954 F.3d at 1031). As in those cases, the burden on Alliance members in complying with Minnesota's product regulations (which is the same burden that in-state companies face) is not enough to overrule the policy decision of the people of Minnesota. That is enough to dismiss the Alliance's claims as a matter of law.

As *Pork Producers* makes clear, the Court need not look to the Alliance's allegations that Amara's Law does not benefit Minnesota because the Alliance does not plausibly allege a substantial burden on interstate commerce. 598 U.S. at 383. But even if the Court does so, the Alliance's allegations fail the plausibility test. True, the Alliance alleges that its products pose no health or safety risk from cooking and accordingly Amara's Law's prohibition carries no benefit to health. Doc. 1, ¶¶ 63-64, 71-72, 117. To the extent those allegations are factual and not sweeping conclusions, they must be taken as true.

But Minnesota – through publicly available documents that the Court may take judicial notice of – asserts a plethora of other environmental concerns with PFAS. PFAS Blueprint at 86, 115-116, 149; *see also* Evan G. Christianson, "Evaluation of Emerging Contaminant Data at Solid Waste Facilities," June 2, 2020 ([https://www.pca.state.mn.us/sites/default/files/Evaluation-of-Emerging-Contaminant-Data-at-Solid-Waste-Facilities_02132020.pdf](https://www.pca.state.mn.us/sites/default/files/Evaluation-of-Emerging-Contaminant-Data-at-Solid-Waste-Facilities_02132020.pdf)). The Alliance's allegations do not address any of those concerns. *See* Doc. 1. And those environmental concerns – even if imperfectly understood – are legitimate interests under controlling case law. *See Maine v. Taylor*, 477 U.S. 131, 148 (1986) (protecting against potential environmental risks is a legitimate local interest).

The dormant Commerce Clause's purpose is not to invalidate state product regulations that some individuals or entities might disagree with, even if those regulations were wrongheaded. Courts are not supposed to be in the business of "decid[ing] what activities are appropriate for state and local government to undertake." *United Hauler's Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 343 (2007). Nor are Courts particularly good forums for hashing out scientific disagreement or weighing economic harm to businesses compared to a state's non-economic interests. *See Nat'l Pork Producers*, 598 U.S. at 380-82 (noting that courts are ill-equipped to weigh the costs and benefits of local regulation and "States may often adopt laws addressing even 'imperfectly understood' health risks associated with good sold within their borders.").

While the Alliance believes that Amara's Law has no benefit, the people of Minnesota, through their elected representatives, disagree. They have determined they are

more concerned with (imperfectly understood) health and environmental risks of PFAS than the Alliance members' profits, and do not want cookware (or other products) containing PFAS to be sold within this State. Because Amara's Law does not substantially burden interstate commerce in achieving that goal, the Alliance's dormant Commerce Clause claim under the *Pike* undue burden test should also be dismissed.

## II.    AMARA'S LAW'S DISCLOSURE REQUIREMENT DOES NOT APPLY TO THE ALLIANCE OR ITS MEMBERS, AND IN ANY CASE IS LAWFUL (COUNTS III-IV).

The Alliance's next set of challenges come to Amara's Law's requirement that manufacturers of products that contain PFAS and are sold in Minnesota must disclose certain information about those products to the Commissioner. But, as the Alliance concedes, its members cannot sell their products containing PFAS in Minnesota, so they are not subject to the disclosure requirement. That means the Alliance does not have standing to challenge it (or at best its challenge is not ripe). But even if the Alliance did have standing, the disclosure requirement does not violate the First Amendment and is not preempted.

### A. The Alliance and Its Members Are Not Subject to the Disclosure Requirement, So They Do Not Have Standing To Challenge It (Counts III-IV).[16]

The Court should dismiss the Alliance's challenges to the disclosure requirement because the Alliance does not have standing to challenge it. It is the Alliance's burden to establish that it has standing and its claims are justiciable. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013). The related doctrines of standing and ripeness require that a plaintiff demonstrate that it will suffer an actual, imminent injury and that its case or harms are not dependent on contingencies or future events that may not occur as expected or at all. *See, e.g.*, *Trump v. New York*, 141 S. Ct. 530, 535 (2020). While both are elastic doctrines that allow for some flexibility in what is concrete and imminent enough to litigate, both require that the threatened harm be substantially likely to occur and not

---

[16] The Alliance, at times, seems to take issue with Minn. Stat. § 116.9432, subd. 4, which allows the Commissioner to require testing of products sold in Minnesota if she has reason to believe they may contain PFAS (though the Alliance does not define the "disclosure requirement" to include subd. 4 and the "disclosure requirement" is what it challenges, *see* Doc. 1 ¶ 84). *Id.* ¶ 51. For similar reasons as attend disclosure requirement, the Alliance does not have standing to bring such a challenge (or the challenge is not ripe). Specifically, the Alliance affirmatively pleads its members cannot sell cookware containing PFAS in Minnesota. *Id.* ¶ 49 n.4. So unless the Alliance's members plan on violating Amara's Law by continuing to sell products that *do* contain PFAS into Minnesota – which the Alliance does not plead – they would not be subject to subdivision 4's testing or notification requirements. Minn. Stat. § 116.943, subd. 4(d)-(e) (only requiring notification if a person is selling a prohibited product). The Alliance agrees, noting that subdivision 4 aids the Commissioner in "punishing *violations*" of Amara's Law's ban on selling products containing PFAS. Doc. 1 ¶ 51. In any case, the Court is not required to conjure up unpled allegations that the Alliance's members may someday violate Amara's Law such that they may be subject to subdivision 4 to provide the Alliance an advisory opinion on subdivision 4's lawfulness. *See Warmington*, 998 F.3d at 796; *California v. Texas*, 593 U.S. 659, 670-73 (2021).

rendered abstract by unknown factual contingencies. *See Clapper*, 568 U.S. at 409 ("'Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose' … and 'allegations of *possible* future injury' are not sufficient.") (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 565, n.2 (1992) and *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis in original)); *Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1038 (8th Cir. 2000) (noting that ripeness is a matter of degree, but "courts shy from settling disputes contingent in part on future possibilities"). As a bedrock principle of standing, litigants that are not subject to statutes do not have standing to challenge those statutes. *Cnty. Court of Ulster Cnty., N.Y. v. Allen*, 442 U.S. 140, 154-55 (1979).

Here, the Alliance affirmatively pleads that neither it nor its members are subject to the disclosure requirement with respect to the at-issue cookware. Doc. 1 at ¶¶ 49 n.4, 84. The Alliance is right about the total effect of Amara's Law: because its members cannot sell their cookware containing PFAS in Minnesota, *see* Doc. 25 at 2, they are not required to disclose anything to the Commissioner. Minn. Stat. § 116.943, subd. 2(a). That presents the Alliance with three related and dispositive standing problems: (1) the disclosure requirement does not require its members to do anything that would cause them injury, (2) even if they had some injury, it would not be traceable to a statute that does not apply to them, and so (3) an order enjoining the disclosure requirement would not affect them. *See, e.g., Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (standing requires an injury in fact that is traceable to the statute that is likely to be redressed by a favorable decision). In short, neither the Alliance nor its members have standing to challenge a statutory disclosure

requirement that they acknowledge does not apply to them. *Ulster Cnty.*, 442 U.S. at 154-55.

The Alliance attempts to save its disclosure requirement claims by hypothesizing that *if* someday Amara's Law changes or is enjoined, and its members are allowed to sell cookware containing PFAS in Minnesota, *then* they would be subject to Amara's Law's disclosure requirement. Doc. 1 at ¶¶ 49 n.4, 84. As this Court has already determined, it is "highly unlikely" that it will enjoin Amara's Law's PFAS-cookware prohibition in this case. Doc. 25 at 13. And the Alliance does not allege any facts that could lead this Court to believe that it is probable or imminent that the Minnesota Legislature will reverse its own course and allow cookware containing PFAS to be sold in Minnesota. *See* Doc. 1. The Alliance's conjecture that the legal landscape could radically change while this lawsuit is pending is exactly the sort of hypothetical that the Supreme Court has ruled undermines standing, rather than confers it. *See Clapper*, 568 U.S. at 410.

In short, the Alliance's challenge to Amara's Law's disclosure requirement is not justiciable because the Alliance's members are not subject to the requirement, have not be injured by it, and are not likely to be subject to it ever (much less imminently).[17] The Court should decline to issue an advisory opinion on a statute that does not affect the Alliance or its members. *See California v. Texas*, 593 U.S. 659, 670-73 (2021) (standing must be tied

---

[17] Of course, if any of those contingencies come to pass such that the disclosure requirement would apply to the Alliance's members, nothing stops the Alliance from bringing its claims on those actual facts.

to a statute's enforcement and in the absence of that, courts should not issue advisory opinions).

**B.    The Disclosure Requirement Does Not Violate the First Amendment (Count III).**

Even setting aside the Alliance's lack of standing, the disclosure requirement does not violate the First Amendment on its face.[18] The disclosure requirement compels only factual speech about products regulated by the State. That disclosure is directly related to the Commissioner's role in determining potential exceptions to Amara's Law's upcoming near-blanket prohibition of selling products containing PFAS in Minnesota.

It is important to start by understanding what Amara's Law requires manufacturers who continue to sell products containing PFAS in Minnesota to disclose. Amara's Law requires limited disclosures about those products: a "brief description of the product" including any numeric code the manufacturer or seller assigns to the product (for specific identification purposes); the purpose for which PFAS is used in the product; the amount of each type of PFAS (identified by its already-assigned chemical abstracts service registry number[19]) in the product; and the contact information for the manufacturer of the product. Minn. Stat. § 116.943, subd. 2(a). That disclosure need not be made to the public, but to

---

[18] Given the Alliance's concession that the disclosure requirement does not apply to it, the Commissioner assumes the Alliance is making a facial challenge rather than an as-applied challenge. *See Wash. St. Grange v. Wash. St. Republican Party*, 552 U.S. 442, 449-50 (2008). Facial challenges are disfavored and only succeed when a plaintiff establishes there is no possible set of circumstances under which the law would be valid. *Id.*

[19] See https://www.cas.org/cas-data/cas-registry for information about the chemical abstracts service registry. (Last accessed Feb. 28, 2025.)

MPCA's Commissioner. *Id.* And the vast majority of that information is already publicly disclosed by manufacturers or sellers: UPCs appear on every product sold, manufacturers' general contact information is typically available on the internet, and companies already register chemical components with the chemical abstracts service.

Amara's Law does not require manufacturers to parrot an opinion about PFAS or make any statement about the safety of those chemicals or their products. *Id.* Nor does it restrict manufacturers from making claims about their products. For example, nothing in subdivision 2 prevents Alliance members (or other manufacturers who are actually subject to subdivision 2) from declaring their products containing PFAS are "safe," in advertising or anywhere else.

Instead, Amara's Law only requires manufacturers to disclose PFAS's presence and purpose in their products to the Commissioner. It does so to facilitate potential exceptions to an otherwise near-total ban on products containing PFAS: so that the Commissioner can determine whether PFAS's use in that product is "currently unavoidable," which she can then carve out by rule from the blanket prohibition in 2032. *See* Minn. Stat. § 116.943, subd. 5(c) ("The commissioner may specify specific products or product categories for which the commissioner has determined the use of PFAS is a currently unavoidable use.").

### i. The Disclosure Requirement Is Rationally Related to the Legitimate Purpose of Determining Whether Current PFAS Use Is Unavoidable and Should Be Allowed in Minnesota.

With that in mind, we turn to the First Amendment. Commercial speech is generally afforded less First Amendment protection than non-commercial speech. *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 637 (1985). When a

government seeks to *restrict* commercial speech, it may only do so in service of a substantial government interest. *Id.* at 638. But commercial *disclosure* requirements – when a government compels speech related to products or services – are afforded more deference. *Id.* at 651. Specifically, disclosure requirements must be reasonably related to the State's legitimate regulatory interests to be valid. *Id.* Amara's Law's disclosure requirement easily passes that test.[20]

As an initial matter, Amara's Law has not required the Alliance's members to disclose *anything* – nor will it, absent a massive change in law. *Supra* Argument § II(A). And the Alliance does not allege that the required disclosures would be unconstitutional in all circumstances. *See, e.g.*, Doc. 1, ¶ 95 (alleging only unconstitutionality "as applied to the Subject Cookware"). That failure is enough to dispense with a facial challenge to the disclosure requirement (and that is the only kind of challenge the Alliance can bring, since the disclosure requirement does not apply to the Alliance). *1-800-411-Pain Referral Svc., LLC v. Otto*, 744 F.3d 1045, 1060 (8th Cir. 2014).

---

[20] The Alliance claims that *Zauderer* only applies to commercial *advertising*, not commercial speech broadly. But *Zauderer*'s reasoning and terms are not just limited to advertising, and Amara's Law's disclosure requirement only applies in the context of commerce: when products are being *sold* in Minnesota. So the fact that Minnesota requires a less-public disclosure (to the Commissioner versus in packaging or advertising) does not make a constitutional difference, and in fact demonstrates that the State more-narrowly tailored its compelled disclosure than it could have.

But the Alliance's challenge fails the substance of *Zauderer* too.[21] Minnesota is entitled to regulate what is sold within its borders – even by prohibiting certain products or chemicals. *Guy v. Baltimore*, 100 U.S. at 443. Here, Minnesota has chosen to prohibit the sale of products containing PFAS out of health, safety, and environmental concerns. *Supra*, Facts §§ I-II. But Amara's Law also recognizes that some uses of PFAS might be so compelling or important that they could justify a carve-out from that ban. Minn. Stat. § 116.943, subd. 5(c).

Amara's Law facilitates that process by requiring manufacturers who are currently selling products set to be banned by 2032 to provide the Commissioner with the information she needs to evaluate whether the use of PFAS in those products is currently unavoidable. *Id.*, subd. 2. Each piece of the disclosure is directly relevant to that purpose: a description of the product, what PFAS does in the product, and what type of PFAS is used all allow the Commissioner to weigh the utility of PFAS in each product with safety concerns connected with the specific chemical formula and amounts used. And all of those pieces of information are factual and uncontroversial – they are just descriptions of the product being sold. *Zauderer*, 471 U.S. at 651 (noting that disclosing factual and uncontroversial information is a minimal burden on commercial speech). In other words,

---

[21] *Zauderer* dealt with disclosures meant to correct misleading advertising, which is not at issue here. But its reasoning applies with equal force: Here, Minnesota's interest is not in consumer deception, but in consumer and environmental safety and the Commissioner's ability to carve out unavoidable uses of PFAS from Amara's Law's ban, if necessary. The disclosure requirement should be analyzed relative to that interest.

the disclosures are reasonably related to the State's interest in carving out important and unavoidable PFAS use from Amara's Law's ban.[22]

### ii. The Disclosure Requirement Also Satisfies the *Central Hudson* Test.

Even if the Court goes to the more exacting *Central Hudson* standard of review,[23] Amara's Law's disclosure requirement would satisfy it. Under *Central Hudson*, courts analyze four factors to test the constitutionality of a law restricting commercial speech: (1) whether the commercial speech at issue concerns unlawful activity or is misleading; (2) whether the governmental interest is substantial; (3) whether the challenged regulation directly advances the government's interest; and (4) whether the regulation is no more extensive than necessary to further that interest. *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557 at 566.

---

[22] Of course, if a manufacturer does not want to provide that information to the Commissioner, it can simply stop selling products containing PFAS in Minnesota earlier than it would otherwise be required to (in 2032, when all PFAS-containing products are banned). Indeed, that is the only consequence to failing to provide the disclosure. Minn. Stat. § 116.943, subd. 2(d).

[23] The Alliance argues for an even higher standard of review because it asserts Amara's Law discriminates based on the speaker or the content of the speech. Doc. 1, ¶ 87. That is wrong: if a restriction is content- or speaker-discriminatory, this Circuit applies the *Central Hudson* heightened scrutiny test. *1-800-411-Pain Referral Servs., LLC v. Otto*, 744 F.3d 1045, 1055 (8th Cir. 2014). But the Eighth Circuit did not apply *Central Hudson* to a *disclosure* requirement, only a speech *restriction*, which is not at issue here. *Id.* at 1060. That is why *Central Hudson*'s reasoning may feel like a bad fit for this situation – it is. In any case, Amara's Law does not distinguish favored from disfavored speech or speakers: it applies to any manufacturer of a product containing PFAS sold in Minnesota, and requires a factual description of the product. Minn. Stat. § 116.943, subd. 2. Accordingly, *Zauderer* is the better fit for the Alliance's challenge.

Nothing about the disclosure requirement is related to misleading information, and if a manufacturer must disclose information about its products, the sale of those products is not yet legally prohibited by Amara's Law. *See* Minn. Stat. § 116.943, subd. 2. Admittedly, then, the State's regulation of commercial speech must be more circumscribed than it may otherwise be. *Cent. Hudson*, 447 U.S. at 564.

But here, the government's interest in learning about the purpose for and types of PFAS being used in products is substantial. By 2032, Minnesota will ban the sale of almost all products containing PFAS. If any product is to avoid that ban, the Commissioner must determine that it is a "currently unavoidable use" of PFAS and carve it out of the prohibition by rulemaking. Minn. Stat. § 116.943, subd. 5(c). In short, Amara's Law recognizes that PFAS may have an important and irreplaceable role to play in some products for now. Allowing Minnesotans to continue to continue to access those products is a substantial interest that easily satisfies the second prong of the *Central Hudson* inquiry.

But to determine whether that is true for any product, MPCA's Commissioner must have relevant information about PFAS and those products. That is exactly – and narrowly – the information that Amara's Law requires manufacturers to disclose: what the product is, what sort of and how much PFAS is in it, and what the PFAS does in the product. Minn. Stat. § 116.943, subd. 2(a). The only additional piece of information sought is contact information for the manufacturer – which allows the Commissioner to communicate with the manufacturer with follow up questions about the information. That direct relationship between the government's interest and the information it seeks satisfies *Central Hudson*'s third and fourth prong.

28

And Amara's Law goes even further to narrow its burden: it allows the Commissioner to waive the disclosure requirement if she can access the information elsewhere. Minn. Stat. § 116.943, subd. 3. In other words, Amara's Law does not require manufacturers to disclose just for the sake of making them speak, but to provide the Commissioner with information she does not already have that she needs to evaluate the products in question. Furthermore, unlike advertising disclosure requirements like the type analyzed in *411-Pain* and *Zauderer*, Amara's Law does not require manufacturers to disclose that information to the public, but only to the regulating authority. That narrowly tailored disclosure easily satisfies *Central Hudson*'s fourth prong.

All told, the Alliance's First Amendment challenge to the disclosure requirement is of a piece with its dormant Commerce Clause challenges: it is based on the belief that Minnesota should not be entitled to regulate its members' products. That is wrong. The First Amendment does not prohibit states from collecting information about the products it regulates. Amara's Law's disclosure requirement is well-tailored to its purpose of determining if products should be carved out of Minnesota's ban on products with PFAS, so the Alliance's First Amendment claim should be dismissed.

## C.  The Disclosure Requirement Is Not Preempted by the Defend Trade Secrets Act (Count IV).

Finally, the Alliance's claim that the disclosure requirement is preempted by the Defend Trade Secrets Act is wrong on the law. The Defend Trade Secrets Act provides a private right of action against anyone who misappropriates or steals trade secrets for economic benefit or for the benefit of a foreign government. *See* 18 U.S.C. §§ 1831, 1832

29

(a). The Act specifically carves out trade secret disclosure to a state government from its prohibitions and its private right of action. *Id.* § 1833(a)-(b)(1)(A).

Federal law may preempt state laws in three ways: (1) expressly, (2) by conflicting with state law, or (3) by prohibiting states from taking any action in the field. *See, e.g., Pharm. Rsch. and Mfrs. of America v. McClain*, 95 F.4th 1136, 1141 (8th Cir. 2024). Of course federal law is supreme; but consideration under the Supremacy Clause still begins with "the assumption that the historic police powers of the states are not to be superseded by Federal Act unless that is the clear and manifest purpose of Congress." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (cleaned up and quotations omitted). No type of preemption applies here.

First, the Defend Trade Secrets Act does not expressly preempt states from requiring disclosures about products to state regulators. *See* 18 U.S.C. §§ 1831, *et. seq.* In fact, it expressly *disclaims* any effect on federal or state governmental activities. *Id.* § 1833(a)(1). Second, the Defend Trade Secrets Act does not occupy the entire field of trade secret protection (much less product regulation) – again, it expressly disclaims that scope. *Id.* § 1838. Third, it is not impossible for manufacturers to "comply" with the Defend Trade Secrets Act (which simply provides them remedies in the case of misappropriation) and to comply with Amara's Law's disclosure requirement. *McClain*, 95 F.4th at 1140 (conflict preemption exists when it is impossible to comply with both state and federal law). That is because the two statutes regulate entirely different conduct and entirely different entities. Indeed, the Defend Trade Secrets Act notes it does not apply to lawful activity conducted by states. 18 U.S.C. § 1833(a)(1).

In short, nothing in the Defend Trade Secrets Act has anything to say about state regulation of products or disclosure of product information to state regulators.[24] Accordingly, it does not preempt Amara's Law's disclosure requirement. The Alliance's preemption claim should be dismissed.

## CONCLUSION

The Alliance's lawsuit boils down to an argument that the United States Constitution prohibits states from regulating its members' products. Because it does not, this case should be dismissed under Rule 12(b)(6).

---

[24] In addition, the Alliance's substantive claims under the Defend Trade Secrets Act and First Amendment – that manufacturers cannot be required to disclose what is in their products to regulators – are stunning when lined up next to the Alliance's arguments in support of their dormant Commerce Clause claim and motion for an injunction. Essentially, the Alliance wants it both ways. "Our PFAS formulation is safe," they say on one hand – "Amara's Law bans too broadly." *See, generally* Doc. 1, ¶¶ 64-72; Doc. 12, at 20-22; Doc. 23. But then they claim a constitutional right to prohibit Minnesota from learning what their PFAS formulations are – which would allow Minnesota to test the Alliance's representations about safety.

Dated:  March 10, 2025

KEITH ELLISON
Attorney General
State of Minnesota

 /s/ Emily B. Anderson
Emily B. Anderson (#0399272)
Assistant Attorney General
(651) 583-7395
Emily.Anderson@ag.state.mn.us

Oliver J. Larson (#0392946)
Assistant Attorney General
(651) 757-1265
Oliver.Larson@ag.state.mn.us

445 Minnesota Street, Suite 600
St. Paul, MN 55101-2131
Fax: (651) 297-4139

**ATTORNEY FOR DEFENDANT
KATRINA KESSLER
COMMISSIONER, MPCA**