## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| COOKWARE SUSTAINABILITY ALLIANCE, | Case No. 0:25-cv-00041 (JRT/DTS) |
| Plaintiff, | |
| v. | |
| KATRINA KESSLER, in her official capacity as Commissioner of the MINNESOTA POLLUTION CONTROL AGENCY (MPCA), | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| Defendant. | |

## <u>INTRODUCTION</u>

Plaintiff Cookware Sustainability Alliance's Complaint properly pleads an as-applied constitutional challenge to a Minnesota law banning the sale of any cookware made with fluorocarbons. The Complaint does not challenge every application of the Minnesota statute. It challenges only application of the statute to nonstick cookware products (the "Subject Cookware"). Defendant Katrina Kessler, in her official capacity as Commissioner of the Minnesota Pollution Control Agency ("Defendant, the "Commissioner," or "the State"), now seeks to dismiss those claims.

The Court denied a preliminary injunction in this case, but it is important to keep in mind that the inquiry at this stage is a very different exercise. The Court's injunction decision means only that Minn. Stat. § 116.943 (the "Statute") remains in effect, as applied

to the Subject Cookware manufactured by Plaintiff's members, while this case moves forward. The State's current motion is *exclusively* a challenge to the facial sufficiency of Plaintiff's Complaint. Thus, while the injunction motion required the Court to make specific factual findings — citing, for instance, the belief of Minnesota state legislators that "PFAS-laden cookware" has an "effect . . . on the human body" as well as "overall environmental effects" from disposal landfills, and "the Statute's well-documented environmental and health benefits" — this motion is decided under a fundamentally different paradigm. Memorandum Opinion, ECF No. 25, at 10, 12. Here, the Court is not engaging in fact-*finding*, but rather evaluating the sufficiency of Plaintiff's claims *assuming the truth of the facts alleged*.

With that paradigm in mind, the resolution of this motion becomes straightforward. The Complaint adequately alleges both a discriminatory effect and an undue burden on interstate commerce, neither of which is justified by sufficient benefits to Minnesotans. Plaintiff's detailed, well-supported allegations easily survive dismissal at this opening stage of judicial review.

## **BACKGROUND**

### I.    **Factual Background**

The Complaint alleges the following facts:

### A.    **Minnesota Passes Amara's Law**

On May 19, 2023, Governor Tim Walz signed Minnesota's new environment and natural resources finance and policy statute into law. Compl. ¶ 45. The new law, codified as Minn. Stat. § 116.943, imposed a complete ban on the sale or distribution of cookware

products containing intentionally added per- and poly-fluoroalkyl substances ("PFAS") in the State of Minnesota beginning January 1, 2025. Compl. ¶¶ 46-48.

The Statute targets a broad array of products containing "intentionally added PFAS," banning sales inside Minnesota of products ranging from cookware to carpets to mattresses to textiles to electronics to ski wax. This is the first law prohibiting the use of intentionally added PFAS in cookware to become effective in the United States. Moreover, Minnesota's Statute does not distinguish between different types of PFAS; rather, it defines any compound with a fully-fluorinated carbon atom to be "PFAS," despite that category including many different sizes of molecules with radically different physical properties, only some of which are subject to safety concerns. *See* Compl. ¶¶ 29, 48, 55, 66-70.

Section 21 of the Statute amends Chapter 60 of the Minnesota Statutes to, among other things, add a section prohibiting the sale or distribution of certain products in Minnesota. *See* Compl. ¶ 46; Statute § 5(a)(3). Specifically, the Statute states that "a person may not sell, offer for sale, or distribute for sale in this state the following products," one of which is cookware, "if the product contains intentionally added PFAS." Compl. ¶ 47; Statute § 5(a). Further, "Cookware" is defined to include "durable houseware items used to prepare, dispense, or store food, foodstuffs, or beverages," including but not limited to pots, pans, skillets, baking utensils and other common cookware items. Compl. ¶ 48; Statute § 1(h). "PFAS" are defined as "a class of fluorinated organic chemicals containing at least one fully fluorinated carbon atom." Compl. ¶ 48; Statute § 1(p). "Intentionally Added" means "PFAS deliberately added during the manufacture of a product where the continued presence of PFAS is desired in the final product or one of the product's

3

components to perform a specific function."  Compl. ¶ 48; Statute § 1(l).

### B.    Cookware Sustainability Alliance

Plaintiff CSA is a 26 U.S.C. § 501(c)(6) incorporated non-profit business league organization organized under the laws of California.  Compl. ¶ 13.  It is dedicated to educating consumers and policy makers through scientifically accurate information about the safety of cookware products in order to promote sound decision-making.  *Id.*  CSA's members are leading cookware manufacturers, all of which are located outside Minnesota, including Meyer Corporation U.S., Groupe SEB, and Tramontina.  Each of CSA's member companies manufactures its cookware outside of Minnesota.  *See* Compl. ¶ 14.

CSA's members produce cookware designed to contain "at least one fully fluorinated carbon atom."  Compl. ¶ 53.  Specifically, CSA's members include "at least one fully fluorinated carbon atom" in their fluoropolymer nonstick products in order to create their nonstick properties.  Compl. ¶¶ 28-29, 54.  As a result, all the fluoropolymer nonstick cookware products manufactured by CSA's members are Subject Cookware,  the sale, offering for sale, and distribution of which is prohibited in Minnesota under the Statute.  Compl. ¶ 56.

### C.    The Nonstick Cookware Market

Nonstick cookware containing fluoropolymers has been FDA-approved as safe for food contact for over 60 years.  Compl. ¶¶ 64-65.  The chemical compounds used to create nonstick coatings in these types of cookware are fundamentally different from the kinds of pernicious PFAS chemicals that animate the Statute.  Compl. ¶¶ 66-67, 72.  The Statute's indiscriminate definition of "PFAS" means that the State ends up throwing out the good

4

with the bad.  *See* Compl. ¶ 76.  And the burdens of that misguided regulation end up falling exclusively on out-of-state commercial actors, which violates the U.S. Constitution.  *See* Compl. ¶¶ 61-62.

### i.  Available Cookware Surfaces

The terms "cookware" and "bakeware" are used, in the cookware and bakeware industry, to refer to products created to be the surfaces on or in which food is cooked for human consumption.  Compl. ¶ 21.  "Cookware" refers to such products designed to be used primarily on stovetop, while "bakeware" refers to such products designed to be used primarily in an oven.  *Id.*  All cookware and bakeware sold in the United States falls into one of two general categories: (1) products that include a nonstick coating ("Nonstick Products"), and (2) products that do not include such a coating ("Other Products").  Compl. ¶ 22.

The Other Products category is made up of a wide variety products manufactured using a number of different materials, including: untreated metal substrates such as stainless steel, cast iron, aluminum, and steel; non-metal substrates such as stoneware and borosilicate glass; enameled substrates, whereby the cooking surface is a layer of enameled porcelain on top of a metal core; and various metal substrates that have some degree of pre-treatment to their surfaces or coatings.  Compl. ¶ 23.

In contrast, the Nonstick Products category is much more narrowly defined.  Compl. ¶ 24.  There exist only three viable and commercially available technologies to create cookware that includes a nonstick coating: (1) fluoropolymer nonstick; (2) sol-gel; and (3) silicone-based nonstick.  *Id.*  While silicone-based nonstick coatings have been

successfully used with certain categories of bakeware, where they are exposed only to the comparatively lower temperatures of an oven, they are not generally used for cookware, which is regularly exposed to much higher temperatures. Compl. ¶ 25. As a result, the only viable technologies to create nonstick cookware are fluoropolymers and sol-gel. Compl. ¶ 26.

Sol-gel, which is the process used to make what is often referred to and marketed as "ceramic" nonstick cookware, consists of a coated cooking surface layered on top of a metal core. Compl. ¶ 27. Because this so-called ceramic is not itself a nonstick surface, the sol-gel process creates a nonstick product by infusing the ceramic layer with a nonstick gel comprised of silicone oil. *Id.*

Fluoropolymer nonstick products, which represent the products traditionally and colloquially referred to as "nonstick" by consumers, are made by applying a coating of a fluoropolymer compound to a metal substrate. Compl. ¶ 28. This fluoropolymer compound is inert, hydrophobic (repels water), naturally repels non-polar fats and oils, and has a high temperature resistance, all of which give the cookware its nonstick properties. *Id.*

There are three different fluoropolymers used to create nonstick surfaces that are approved by the FDA. Compl. ¶ 29. The most commonly used fluoropolymer in the industry is polytetrafluoroethylene ("PTFE"). *Id.* It is sometimes colloquially referred to as Teflon, which is a particular brand name. *Id.* Other fluoropolymers used to create nonstick cookware include fluorinated ethylene propylene ("FEP") and perfluoroalkoxy alkane ("PFA"). *Id.*

All fluoropolymers in use to create nonstick cookware have certain essential features in common. *Id.* In particular, their chemical composition consists of long chains of carbon atoms bonded together. *Id.* These carbon atoms form the spine of the polymer chain, along which fluorine and other atoms are bonded. *Id.* This polymer backbone in the compounds used in nonstick cookware is perfluorinated,[1] substantially influencing the chemical and physical properties of these polymer materials. *Id.*

"Ceramic" and fluoropolymer nonstick products differ in a number of significant ways. Compl. ¶ 30. In terms of usability from the consumer perspective, however, the critical difference between the two is that fluoropolymer coatings are inherently nonstick, while the ceramic layer in a sol-gel system is not. *Id.* Instead, a sol-gel pan keeps its nonstick properties only as long as the silicone oil remains in the "ceramic" layer. *Id.* For that reason, sol-gel ceramic cookware maintains its nonstick properties for significantly less time, and has a much shorter usable life for a consumer, than a fluoropolymer nonstick counterpart. *Id.*

"Ceramic" nonstick and fluoropolymer nonstick products require substantially different production processes. Compl. ¶ 31. Fluoropolymer nonstick coatings are flexible, allowing them to be applied either by (a) rolling the coating onto a metal disk, which then can be shaped into a pan for the final product, or (b) spraying the coating onto a pre-shaped product. *Id.* The ceramic layer in "ceramic" nonstick products, in contrast,

---

[1] A "perfluorinated" compound is one that consists of carbon and fluorine atoms bonded together without any of the carbon–hydrogen bonds that occur in other organic compounds. Compl. ¶ 29 n.3.

is too hard to be shaped after application; consequently, the sol-gel process can only be sprayed. *Id.*

The production processes for "ceramic" and fluoropolymer nonstick likewise involve different compounds sourced from different suppliers, different or modified furnaces, and different equipment. Compl. ¶ 33. Thus, even where these processes share a spraying application in common, practically everything involved in the production process before and after spraying the coating is significantly different. *Id.*

Consequently, existing production infrastructure designed to manufacture fluoropolymer nonstick products cannot be transitioned to a sol-gel manufacturing process easily or cheaply, and without a potentially substantial overhaul. Compl. ¶ 34. In particular, the manufacturing infrastructure that uses a rolling method to produce fluoropolymer nonstick products cannot be used to produce "ceramic" nonstick products without significant investments in new processes and equipment. *Id.*

### ii. The Cookware Market

The cookware market in the United States was estimated to generate over $4 billion in commerce in 2023. *See* Compl. ¶ 35. Nonstick Products represented 62.6% of that market, while Other Products represented the remaining 37.4%. *Id.* The "ceramic" nonstick cookware market is dominated by private label manufacturers and companies such as GreenPan, Blue Diamond, and Gotham Steel, none of which are members of CSA. Compl. ¶ 36. These companies have developed the production capacity and brand recognition to produce well over 60% of the of the ceramic cookware purchased in the United States in 2024. *Id.*

All of CSA's member companies offer "ceramic" nonstick cookware products. Compl. ¶ 37. However, those ceramic products represent a comparatively small, niche market in CSA's members' cookware product lines. *Id.* In contrast, CSA's members supplied fully 47% of the fluoropolymer nonstick products sold in the United States in the twelve-month period ending September 2024, and 57% of the fluoropolymer nonstick products sold in the State of Minnesota during the same period. Compl. ¶ 38.

### iii. Fluoropolymer Nonstick Products are Manufactured Exclusively Outside Minnesota.

As noted, CSA's membership consists of a number of cookware manufacturers, all of which are located outside Minnesota. Compl. ¶ 39. There is only one cookware manufacturer located in Minnesota. Compl. ¶ 40. That Minnesota-based producer, a company called Nordic Ware, does not produce fluoropolymer nonstick products. Compl. ¶ 41.

Nordic Ware was founded in Minneapolis in 1946, and built its brand on introducing and trademarking the Bundt pan. Compl. ¶ 42. Nordic Ware remains based in Minnesota. It is headquartered and has its manufacturing plant in the St. Louis Park suburb of Minneapolis. *Id.* Nordic Ware has expanded its product lines beyond the Bundt pan since its inception, but the majority of its business remains in bakeware rather than stovetop cookware. *Id.*

While Nordic Ware formerly manufactured a line of fluoropolymer nonstick products, that was only ever an ancillary part of its business. Compl. ¶ 43. In 2024, it discontinued its fluoropolymer products altogether. *Id.* Its nonstick products are now

exclusively of the so-called "ceramic" type.  *Id.*  As a result, since at least September 2024, 100% of the fluoropolymer nonstick products in the global market have been manufactured *outside* of Minnesota.  Compl. ¶ 44.

### D.    The Subject Cookware Poses No Appreciable Risk to Minnesotans.

Nonstick cookware made using fluoropolymers, including the Subject Cookware, has been repeatedly identified as safe by the FDA and other regulatory bodies.  Compl. ¶ 64.  For that reason, PTFE- and FEP-based fluoropolymer nonstick cookware has been FDA approved for food contact as safe for human use and consumption since 1962.  Compl. ¶ 65; *see* 27 Fed. Reg. 10098 (Oct. 13, 1962).   PFA-based fluoropolymer nonstick cookware has likewise been FDA approved for food contact as safe for human use and consumption since 1982.  Compl. ¶ 65; *see* 47 Fed. Reg. 14698 (April 6, 1982).

The fluoropolymers used in nonstick cookware (i.e., PTFE, FEP, and PFA) are fundamentally different in their chemical structures and properties from the small-molecule fluorochemicals that are the subject of the State's concern.  Compl. ¶ 66.  It is these small-molecule fluorochemicals (*e.g.* perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA")) that have received significant attention in both public media coverage and from environmental regulators due to their detected presence in many drinking water sources.  Compl. ¶ 67.

The small-molecule PFAS of recent attention are pernicious because, among other reasons, they are migratable in water (meaning that they are either water-soluble or sit on the surface of water and can be transported with it), can be absorbed in the human body, and are transmitted through the water supply.  Compl. ¶ 68.

By contrast, fluoropolymers such as PTFE are useful in nonstick applications **precisely because they are not water-soluble or migratable in water**. Compl. ¶ 69. To the contrary, they are stationary, inert, and hydrophobic. *Id.* If fluoropolymers such as PTFE had water solubility properties similar to small-molecule PFAS, they would be entirely unsuited to use as a nonstick coating. *Id.*

Fluoropolymers are regularly used in a host of other applications beyond cookware that would be impossible if those fluoropolymers shared properties in common with small-molecule PFAS. Compl. ¶ 70. For instance, PTFE is used in medical devices implanted in the human body, such as pacemakers; PTFE could not be used as a component in implantable medical devices if it were water-soluble and capable of absorption by the body. *Id.*

The fluoropolymers used in the Subject Cookware are incapable of creating or breaking down into the small-molecule PFAS with which the State is concerned. Compl. ¶ 71. Further, these fluoropolymer materials have been shown to contain only "negligible" amounts of PFAS that can migrate to food, and are not a source of small-molecule PFAS after use for cooking, cleaning, or disposal. *Id.* As a result, despite falling within the definition of "PFAS" set forth in the Statute, the fluoropolymers used in the Subject Cookware are not a significant source of the small-molecule PFAS with which the State is concerned. Compl. ¶ 72. The fluoropolymer nonstick products created by CSA's members present no appreciable risk of exposing Minnesotans to small-molecule PFAS, either directly through their use as cookware or indirectly through environmental contamination. *Id.*

In contrast, the primary sources of small-molecule PFAS contamination are not even regulated by the Statute. Compl. ¶ 73. In particular, numerous studies have demonstrated that the primary source of human exposure to small-molecule PFAS comes from sources that contribute to drinking water: wind, rain, and flowing water in the form of lakes, rivers, and runoff. Compl. ¶ 74.

Nothing in the Statute's prohibitions — and in particular nothing in the Statute's regulation of the Subject Cookware — purports to do anything to curb these sources of small-molecule PFAS. Compl. ¶ 75. As a result, the Statute fails to convey a public benefit in two ways: (1) it prohibits the sale of products that that have been evaluated and found to be safe for use by FDA, while at the same time (2) doing nothing to regulate the primary source of exposure to the small-molecule PFAS contaminants with which it is ostensibly concerned. Compl. ¶ 76.

## II.    Procedural History

Plaintiff CSA filed the Complaint in this matter on January 6, 2025. The Complaint sets forth claims for relief under the Commerce Clause of the U.S. Constitution. It also separately challenges the Statute on First Amendment and federal preemption grounds.[2] In order to postpone enforcement of the Statute while those claims are resolved, Plaintiff sought an order from this Court enjoining enforcement of the Statute against its members

---

[2] Plaintiff has met and conferred with the State in advance of this Response, and can represent to the Court that the State has no objection to Plaintiff's voluntary dismissal of Counts III and IV of the Complaint *without prejudice* to renew them in the event and at such time as the Statute's ban on the sale of Subject Cookware is no longer in effect. Plaintiff therefore limits its Response to Defendant's Motion to address only Counts I and II of the Complaint.

during the pendency of this action, which the Court denied.

Defendant now moves to dismiss Plaintiff's Complaint.  For the reasons that follow, Defendant's Motion should be denied.

## ARGUMENT

### I.    Legal Standard

A complaint is sufficient to survive a motion to dismiss so long as it contains "sufficient factual matter, *accepted as true*, to state a claim to relief that is plausible on its face."  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (citation and internal quotation marks omitted) (emphasis added).  "A claim has facial plausibility when the plaintiff [has pleaded] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint need not contain detailed factual allegations, and need only make allegations that raise a right to relief above the speculative level.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Critically, every allegation in the Complaint must be treated as true when evaluating a motion to dismiss.  *See, e.g.*, *Data Mfg., Inc. v. United Parcel Service, Inc.*, 557 F.3d 849, 851 (8th Cir. 2009) ("The factual allegations of a complaint are assumed true and construed in favor of the plaintiff, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" (quoting *Twombly*, 550 U.S. at 556)).

That is a fundamentally different inquiry from the analysis the Court undertook in deciding whether to grant a *preliminary injunction*.  Indeed, courts regularly find that the well-pleaded allegations in a complaint are sufficient to proceed to discovery even after

denying a request for a preliminary injunction. *See, e.g.*, *Travel Tags, Inc. v. UV Color, Inc.*, 690 F. Supp. 2d 785, 808 (D. Minn. 2010) (Tunheim, J.) (finding plaintiff's patent infringement claims did not demonstrate irreparable harm or a likelihood of success on the merits while also denying defendant's motion to dismiss, stay, or transfer); *see also, e.g.*, *Northland Ins. Companies v. Blaylock*, 115 F. Supp. 2d 1108, 1115 (D. Minn. 2000) (holding that, "while the court concludes there is an insufficient factual basis upon which to grant a preliminary injunction, the court does not similarly conclude that plaintiff's claims fail to state causes of action upon which relief can be granted."); *Shafer v. Rutledge*, No. 2:21-CV-00040, 2022 WL 4485175, at *4 (S.D. Tex. Sept. 27, 2022) (finding plaintiff's allegations were sufficient to state various constitutional claims and survive a motion to dismiss, but that plaintiff failed to demonstrate the substantial likelihood of success on the merits required to support a preliminary injunction).

Thus, a motion to dismiss can *only* be granted if a claim would fail as a matter of law *even if the factual allegations set forth in the Complaint were true*. Defendant's attempts to litigate the science (with inapposite summaries that *the State itself* created) and defend the State's indiscriminate PFAS ban are, consequently, irrelevant to the resolution of this motion. The only question before this Court is whether the factual allegations set forth in Plaintiff's Complaint, assumed to be true, are sufficient to state claims for violation of the Dormant Commerce Clause. Because they are, Defendant's motion must be denied.

## II. Defendant's Motion Wrongly Relies on Inapposite, Outside Facts.

Defendant seeks to confuse the issue before the Court by inserting factual claims and citations from outside the Complaint. That effort is improper and the Court should

reject it.

The proper scope of a motion to dismiss is well-established. "[W]hen considering . . . a motion to dismiss under Fed. R. Civ. P. 12(b)(6)[ ], the court generally *must ignore materials outside the pleadings*[.]" *Glow In One Mini Golf, LLC v. Walz*, 37 F.4th 1365, 1370 (8th Cir. 2022) (emphasis added). That general rule is subject to narrow exceptions, namely "materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings." *Id.* It is this public record exception that Defendant seeks to take advantage of here. Def.'s Br. at 2 n.2 (asking the Court to "take judicial notice of the PFAS Blueprint as a public record"). But "[s]uch evidence may not, however, be viewed for the truth of the matters asserted." *LeMay v. Mays*, 18 F.4th 283, 289 (8th Cir. 2021) (citing *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831–32 (8th Cir. 2003)). Rather, a court may only take notice of the *existence* of the public record, not its substance.

Defendant's references to the so-called "PFAS Blueprint" plow through that narrow exception. The Commissioner does not ask the Court simply to take note that this Blueprint — *which the Commission itself authored* — exists; rather, it seeks to use it to establish "basic facts about PFAS in Minnesota," including facts that directly contradict Plaintiff's well-pleaded allegations. *Compare, e.g.*, Def.'s Br. at 3 (claiming, based only on citations to its self-serving "Blueprint," that PFAS as a whole "'bioaccumulate' – which means they build up over time in living organisms, including humans") *and* Complaint at ¶¶ 64 ("The FDA further noted that "[p]olymerized or large molecule PFAS are not absorbed by the human body when ingested."), 66 ("The fluoropolymers used in nonstick cookware,

including PTFE, FEP, and PFA, are fundamentally different in their chemical structures and properties from the small-molecule fluoro*chemicals* that are the subject of the State's concern.") (emphasis in original).

Even more egregiously, the Defendant's improper effort is not limited to its self-authored "Blueprint"; at times Defendant asks the Court to make factual findings based on never-authenticated scientific papers, YouTube videos, news articles, and various companies' websites. *See* Def's. Br. at 3 n.3; 4 n.5; 10 n.7; 11 nn.8, 9; 12 n.11; 18. Even if these sources were properly subject to judicial notice, which they are not,[3] Defendant's attempt to use them for the truth of the matters asserted therein would be improper.[4]

The Court should see Defendant's attempt to expand the scope of its motion for what it is: a tacit admission that the allegations in the Complaint, on their own, are sufficient. If Plaintiff's factual allegations were lacking, presumably the State would seek dismissal on that basis. Because they are not, the State must instead resort to this improper effort to rely on unverified evidence from outside the Complaint. It fails.

What remains is straightforward. The properly-pleaded facts in the Complaint, if true, establish viable constitutional claims. The State's motion must, therefore, be denied.

---

[3] Judicial notice is limited to facts that "are matters of common knowledge or are capable of certain verification." *McIvor v. Credit Control Servs., Inc.* 773 F.3d 909, 914 (8th Cir. 2014) (quoting *Am. Prairie Const. Co. v. Hoich,* 560 F.3d 780, 798 (8th Cir. 2009)).

[4] Defendant's improper reliance on these materials underscores its persistent effort to ignore basic science in this as-applied challenge. This is not a challenge to regulation "of PFAS," as the State would seemingly prefer so that its factual citations would be relevant. Rather, this is an as-applied challenge to the State's regulation of a specific type of large-molecule PFAS found in Plaintiff's nonstick cookware products: namely, fluoropolymers like polytetrafluoroethylene (PTFE).

### III.     Plaintiff's Dormant Commerce Clause Claims are Facially Sufficient.

The Complaint adequately alleges two distinct violations of the Dormant Commerce Clause.  It sets forth facially plausible facts that, assumed true and construed in the light most favorable to Plaintiff, state claims for each of those violations.  Accordingly, the Defendant's motion to dismiss Counts I and II of the Complaint should be denied.

The Constitution expressly entrusts to Congress the power to "regulate Commerce . . . among the several States."  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (quoting U.S. CONST. art. I, § 8, cl. 3).  That enumerated power is both affirmative and negative; Congress may legislate, and the individual states are precluded from legislating in any way that undermines that affirmative power.  Thus, even if Congress has not exercised its regulatory authority, the Commerce Clause "contain[s] a further, negative command" — known as the Dormant Commerce Clause, that prohibits "certain state [economic regulation] even when Congress has failed to legislate on the subject." *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995).  Commerce between the states is the exclusive prerogative of the national government, and a single state may not promote its own economic advancement at the expense of the citizens of other states.

A state may violate the Dormant Commerce Clause in two separate ways.  **First**, a law is suspect and subject to strict scrutiny, "if it 'overtly discriminates' against interstate commerce — either facially or through 'a discriminatory purpose or a **discriminatory effect**.'" *Entergy Arkansas, LLC v. Webb*, 122 F.4th 705, 711 (8th Cir. 2024) (quoting *LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018, 1026 (8th Cir. 2020) (emphasis

added)).  "Discriminatory effect" is sufficient to trigger strict scrutiny, on its own, even in the absence of intentional discrimination or economic protectionism.  *See SDDS, Inc. v. State of S.D.*, 47 F.3d 263, 270 (8th Cir. 1995) ("even if South Dakota had not openly declared a discriminatory purpose, the referendum is discriminatory in its effect, and this type of discrimination will also trigger strict scrutiny"); *see also Smithfield Foods, Inc. v. Miller*, 367 F.3d 1061, 1065 (8th Cir. 2004); *S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 593 (8th Cir. 2003).  **<u>Second</u>**, a state's law "may also be struck down for imposing a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits.'"  *Id.* (quoting *LSP Transmission*, 954 F.3d at 1026, and *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).  This second category of claims is sometimes referred to as "*Pike* claims," after the Supreme Court case that established the balancing test used to evaluate burdens on interstate commerce.

The Complaint adequately pleads <u>both</u> species of constitutional claims.  It alleges both that the Statute imposes an impermissible discriminatory effect against out-of-state commerce <u>and</u> a substantial burden on interstate commerce that is unjustified by its putative local benefits.  In particular, it alleges that the Statute is an unconstitutional violation of Congress's Dormant Commerce Clause authority as applied to the Subject Cookware manufactured by Plaintiff's member companies.

      *i.*   *The Complaint Adequately Alleges An Impermissible Discriminatory Effect on Out-of-State Commerce.*

First, the Complaint adequately alleges that the Statute is unconstitutional because it has a discriminatory effect on out-of-state commerce.  This constitutional inquiry can

rest on the practical impact of a State's regulation alone, without regard to its intent. That practical effect is clear: Beginning on January 1st, the Statute prohibited the sale of products made outside of Minnesota. Compl. ¶¶ 44-47. Simultaneously, the only cookware company that manufactures products in Minnesota evaded the Statute's reach as a result of the exclusion of the non-Minnesota-made products. *See* Compl. ¶¶ 39-43. The result, regardless of intent, is discriminatory: The Statute punishes <u>only</u> commerce outside the State while sparing the only producer within its borders.

Courts strike down laws, such as the Statute here, that discriminate against interstate commerce "unless the state or locality can demonstrate, 'under rigorous scrutiny, that it has no other means to advance a legitimate local interest.'" *LSP Transmission*, 954 F.3d at 1026 (quoting *Hampton Feedlot, Inc. v. Nixon*, 249 F.3d 814, 818 (8th Cir. 2001)). Such discrimination need not appear in the explicit statutory text; "even if it is facially neutral, the law may have a discriminatory purpose or a discriminatory effect." *U & I Sanitation v. City of Columbus*, 205 F.3d 1063, 1067 (8th Cir. 2000). Thus, a state law triggers strict scrutiny when it imposes a discriminatory effect on interstate commerce. And a law need only "favor[] in-state economic interests over out-of-state interests" to "discriminate[] in effect." *LSP Transmission*, 954 F.3d at 1030 (quoting *IESI AR Corp. v. Nw. Ark. Reg'l Solid Waste Mgmt. Dist.*, 433 F.3d 600, 605 (8th Cir. 2006)).

(1)    The Complaint Properly Alleges Discriminatory Effect.

There can be no question that the Complaint alleges that the Statute results in a discriminatory effect on out-of-state interests. The cookware manufacturing industry is dominated by a relatively small number of manufacturers, who together are responsible for

the overwhelming majority of the market.  *See* Compl. ¶¶ 35-38.  Of those producers, there

is exactly **one** located in Minnesota: Nordic Ware.  *See* Compl. ¶¶ 40, 42.

Nordic Ware does not produce fluoropolymer nonstick products.  *See* Compl. ¶¶ 41,

43-44.  As a result, it is unaffected by the Statute's cookware ban.  Compl. ¶¶ 41, 43, 114.

Everything else that is produced for the consumer cookware industry — and 100% of the

fluoropolymer nonstick products — is manufactured, distributed, and sold from outside

Minnesota.  *See* Compl. ¶ 44.  This out-of-state commerce is, consequently, the sole subject

impacted by the cookware ban in the Statute.

The concrete, practical implications of this law are starkly discriminatory:  Since

Day 1 of its enforcement, the Statute has prohibited the sale of cookware products made

*only* by out-of-state producers but imposed no burden on their sole competitor based in

Minnesota.  In other words, although the ban is facially neutral, in practice and effect it

"favors [the] in-state economic interests" of the only cookware manufacturer in Minnesota

while burdening only out-of-state manufacturers with a ban.

It is important to emphasize that proof that this discriminatory effect was intentional

is unnecessary to succeed on the merits of Plaintiff's claim; *regardless of the Legislature's*

*intent*, a state regulatory scheme that imposes merely a disparate <u>effect</u> on out-of-state

commerce must survive strict scrutiny to avoid violating the Congressional prerogatives

enshrined in the Dormant Commerce Clause.  *See, e.g.*, *U & I Sanitation*, 205 F.3d at 1067.

The State's cookware ban creates a discriminatory effect because the Statute's prohibitions

only impact out-of-state manufacturers.  The Statute therefore places an impermissible

thumb on the scale for a Minnesota manufacturer at the expense of the rest of the country's

manufacturers. That is precisely the kind of parochial favoritism — regardless of intent — that the Dormant Commerce Clause forbids.

The State wrongly suggests that that mere facial neutrality immunizes the Statute from constitutional challenge. That misstates and misunderstands the law. The Eighth Circuit has been crystal clear that "discriminatory effect" is enough, in and of itself, to trigger heightened scrutiny. *See, e.g.*, *Entergy Arkansas*, 122 F.4th at 711 ("Under the dormant Commerce Clause, a law is subject to strict scrutiny if it overtly discriminates against interstate commerce—either facially or through a discriminatory purpose *or a discriminatory effect*.") (internal quotations omitted) (emphasis added); *see U & I Sanitation*, 205 F.3d at 1067 (setting forth the same standard); *Smithfield Foods*, 367 F.3d at 1065 (noting that Dormant Commerce Clause jurisprudence "recognizes three indicators of discrimination against interstate commerce," one of which is that "a statute has a discriminatory *effect*") (emphasis in original); *S.D. Farm Bureau*, 340 F.3d at 593 ("[E]ven if a state law responds to legitimate local concerns and is not discriminatory either in its purpose or on its face, the law could discriminate arbitrarily against interstate commerce, that is, it could have a discriminatory effect." (citing *Maine v. Taylor*, 477 U.S. 131, 148 n.19 (1986))); *SDDS*, 47 F.3d at 270 ("[E]ven if South Dakota had not openly declared a discriminatory purpose, the referendum is **discriminatory in its effect**, and this type of discrimination will also trigger strict scrutiny") (emphasis added). This is not, as the Defendant maintains, a situation like that present in *Exxon Corp. v. Governor of Maryland*, where the regulation in question targeted only out-of-state producers because no in-state producers existed. 437 U.S. 117, 125 (1978). Rather, here, there is at least one in-state

21

manufacturer of cookware, who no longer suffers any burdens from the Statute because it no longer manufactures the product targeted by the Statute.

The Complaint plausibly alleges that the *practical effect* of this situation, regardless of the State's intent, is to create a "competitive advantage" for the in-state producer. *See id.* at 126; Compl. ¶¶ 113-15. That allegation, which the Court must accept as true at this stage, is sufficient to establish discriminatory effect.

> (2)    The Complaint Alleges the Statute Cannot Survive Strict Scrutiny.

The Complaint's well-pleaded allegations concerning the Statute's discriminatory effect trigger strict scrutiny. The Complaint adequately alleges that State cannot demonstrate that the cookware ban, as applied to Plaintiff and its member companies, advances a legitimate state interest that the State cannot address by any other means. *See, e.g.*, *SDDS, Inc.*, 47 F.3d at 271-72 (holding that a South Dakota referendum attempting to exclude out-of-state trash had a discriminatory effect and failed to survive strict scrutiny because the referendum provided no local benefit and a nondiscriminatory alternative was available). The Statute purports to serve the health and welfare of Minnesota citizens. In fact, however, the Complaint articulates in great detail how the prohibition on the Subject Cookware does nothing to promote that noble goal at all.

The Statute's preferential treatment of in- versus out-of-state manufacturers is not narrowly tailored, and it does not promote Minnesotans' health for at least three reasons.[5]

---

[5] Not only does the Statute fail to advance the health of Minnesota citizens, it also imposes significant and unnecessary local injuries. Removing fluoropolymer nonstick products from the Minnesota market means consumers will need to switch to ceramic

**First**, the Statute as a whole imposes a blanket ban on all PFAS, an extremely broad category of chemicals, without distinction between their varying chemical compositions or applications. *The Complaint alleges that, as a matter of objective scientific fact, the fluoropolymer compounds used in nonstick cookware are not the small-molecule PFAS that animate the State's health concerns.* Compl. ¶ 66. Indeed, regulatory authorities have carefully examined and repeatedly confirmed the safety of fluoropolymers for food contact as used in nonstick cookware. *See* Compl. ¶¶ 64-65, 71 (documenting the consistent approval by FDA and other regulators, and the scientific consensus that "negligible amounts of PFAS in [fluoropolymer] coating can migrate to food"). The cookware ban's sweeping and undifferentiated prohibition on PFAS is the opposite of narrow tailoring.

**Second**, the Statute does not advance the State's interest — *as applied to the Subject Cookware* — because the scientific evidence demonstrates that the fluoropolymer compounds used in the Subject Cookware pose no risk to consumer health and safety. As noted above, fluoropolymer applications in nonstick cookware have been approved for food contact use by the FDA since the 1960s and have been consistently found to pose no risk to consumers from their use in food preparation. *See* Compl. ¶ 65. Likewise, the overwhelming scientific consensus agrees that the fluoropolymers used in nonstick

---

alternatives. Ceramic pans are both more expensive and less durable, meaning Minnesota consumers will be forced to incur substantial additional financial burdens to achieve the same useful product life. *See* Compl. ¶ 30 (alleging that "sol-gel ceramic" cookware "has a much shorter usable life for a consumer" because it loses its nonstick properties, requiring more frequent replacement). Likewise, the switch to ceramic pans will cause a *greater* burden on the Minnesota environment: ceramic pans must be replaced more often than nonstick, meaning more pans in Minnesota landfills for each consumer. *See* Compl. ¶ 30.

cookware are <u>not</u> a toxicological hazard because they are <u>not</u> absorbable by the human digestive tract. *See* Compl. ¶ 64 (quoting the FDA's conclusion that "[p]olymerized or large molecule PFAS are not absorbed by the human body when ingested"). The Subject Cookware, therefore, do not pose a risk to Minnesotans who use them to cook. And, for the same reasons, large-molecule PTFE cookware products cannot present a risk of shedding small-molecule PFAS into the environment once thrown away. *See* Compl. ¶ 71. As a result, banning the Subject Cookware does nothing at all to serve any health or wellness goal the State envisioned with respect to other PFAS products not at issue in this as-applied challenge.

**<u>Third</u>**, more effective means exist to address the State's concerns with small-molecule PFAS (which the Subject Cookware do not contain). As discussed, the cookware ban is a scientifically *in*effective tool to address that concern. Instead, the primary risk to Minnesotans from PFAS comes from exposure to small molecules capable of accumulating in the human body and other bodies in the human food chain. Compl. ¶¶ 67-68. The principal exposure source for such toxins, however, comes from meteorological trends and the water cycle, and their subsequent presence in drinking water. Compl. ¶¶ 67, 74. The very features that make such small-molecule PFAS capable of accumulating in the body also make them water soluble, meaning they proliferate without regard to state lines by evaporation, condensation, and the movement of water throughout the continent's rivers and lakes. Compl. ¶¶ 68, 74. In other words, a ban that seeks to keep a nonstick PTFE skillet from Texas out of a Minneapolis landfill does nothing at all to prevent small-molecule PFAS from infiltrating via rain from the Dakotas or runoff from Canada. *See*

Compl. ¶ 75.[6]

In short, the Complaint demonstrates that the Subject Cookware are "collateral damage" from an overboard, sweeping, and indiscriminate attempt to regulate in this area, motivated by a concern over a *different* family of PFAS compounds. The collateral damage the Complaint describes cannot satisfy the searching judicial review of strict scrutiny. Plaintiff made allegations that demonstrate the State cannot make a sufficient showing to justify the discriminatory effect of its cookware ban on interstate commerce. The Complaint therefore adequately states a claim for discrimination against out-of-state commerce in violation of the Dormant Commerce Clause. The Motion to Dismiss should therefore be denied with respect to Count I.

       *ii.  The Complaint Properly Alleges that the Statute Unjustifiably*
           *Burdens Interstate Commerce.*

The Complaint also states a claim for violation of the Dormant Commerce Clause because the Statute places an undue and excessive burden on interstate commerce. A state economic regulation violates the Dormant Commerce Clause when it (a) imposes a substantial burden on interstate commerce, *see Pork Producers*, 598 U.S. at 383-84,[7] and

---

[6] And, of course, the fluoropolymer compound in the PTFE skillet from Texas cannot create the kind of small-molecule PFAS in the Dakota raincloud anyway. *See* Compl. ¶ 71.

[7] Although the Justices disagreed about how to assess whether the petitioner in *Pork Producers* had properly pleaded a "substantial burden," a controlling majority agreed that the Dormant Commerce Clause analysis requires a showing of a substantial burden on interstate commerce before a court applies the *Pike* balancing test. *See* 598 U.S. at 383-84 (four-Justice plurality concluding that petitioners' claim failed for failure to adequately allege a substantial burden on interstate commerce), and 598 U.S. at 393-94 (Barrett, J., concurring in part, and concluding that petitioners plausibly alleged such a substantial burden).

(b) that burden is "clearly excessive in relation to the putative local benefits." *Entergy Arkansas*, 122 F.4th at 711 (quoting *LSP Transmission*, 954 F.3d at 1026). The Statute's cookware ban fails on both grounds.

The allegations in the Complaint set forth a substantial burden on interstate commerce. A majority of the Justices in *Pork Producers* agreed that *Pike* claims are most viable, and a substantial burden on interstate commerce easiest to establish, where the challenged law discriminates in some way against out-of-state commerce. *See Pork Producers*, 598 U.S. at 377-79 (plurality opinion), *id.* at 391-92 (Sotomayor, J., concurring in part); *see also Truesdell v. Friedlander*, 80 F.4th 762, 774-75 (6th Cir. 2023) (noting that the plaintiff had "not gotten off to an 'auspicious start' in proving a substantial burden" for *Pike* claim purposes because it, unlike the CSA here, *failed* to demonstrate that the challenged law had a discriminatory effect). As discussed extensively above, the Complaint alleges that the Statute at issue here imposes such effects, and therefore "falls well [inside] *Pike*'s heartland." *Pork Producers*, 598 U.S. at 380. And in both *Pork Producers* and subsequent cases, courts have emphasized that the substantial burden must stretch beyond costs imposed on a particular out-of-state company to impact out-of-state *commerce*. *See Pork Producers*, 598 U.S. at 384 ("If the dormant Commerce Clause protects the 'interstate market . . . from prohibitive or burdensome regulations,' . . . it does not protect 'particular . . . firms' or 'particular structure[s] or methods of operation.'") (quoting *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127-28 (1978) (all but second alteration in original); *Truesdell*, 80 F.4th at 774 (emphasizing that the burdens relevant for *Pike*-test purposes are "only *interstate-commerce* burdens" (emphasis in original)).

26

Here, unlike cases that simply made it more *expensive* for an out-of-state company to comply with state regulation, the Statute completely bans entire classes of products, including the Subject Cookware.  That prohibition on the Subject Cookware has cascading effects throughout interstate commerce that reach far beyond CSA's members.  *See* Compl. ¶¶ 58-60.  The suppliers of the raw chemicals necessary to produce fluoropolymers, the chemical producers of the fluoropolymers, and the manufacturers of essential components in the distribution system for such fluoropolymers all suffer from the prohibition of fluoropolymer nonstick products.  *See* Compl. ¶¶ 59, 62.  Indeed, consideration of the sheer number and diversity of participants in interstate commerce who are impacted by the Statute's ban is staggering:[8] factory workers who make tanks used to store and transport fluoropolymers; machinists who produce the parts to maintain the roller-production facilities that cannot be adapted to the fabrication of "ceramic" nonstick; trucking and logistics companies that must put in place additional administrative controls to ensure that

---

[8] Moreover, the Court's evaluation of substantial burdens is not limited to the burdens caused by just the Statute.  Rather, in order to appreciate the magnitude of the burden on interstate commerce, the Court will eventually — at the summary judgment or trial stage — adopt an aggregate analysis whereby it considers the interstate effect on the market if several jurisdictions were to adopt similar ordinances.  *U & I Sanitation v. City of Columbus*, 205 F.3d 1063, 1069 (8th Cir. 2000) ("[T]he practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation.").  Thus, the relevant effect on actors up and down the supply chain is not merely the impact of fluoropolymer nonstick being prohibited in *just* Minnesota; it is the cumulative effect of many states implementing such bans.  Indeed, an inconsistent patchwork of potentially contradictory state regulations is precisely the danger the Commerce Clause seeks to prevent by making regulation of interstate commerce the exclusive prerogative of Congress.

prohibited Subject Cookware is not mistakenly shipped to Duluth instead of Dallas; all of these and more are actors in interstate commerce *beyond* CSA's members who suffer burdens from the Statute's cookware ban.

Thus, as a threshold matter, the Complaint adequately alleges that the Statute imposes a substantial burden on interstate commerce. It forces out-of-state manufacturers to either (a) comply with the law by undertaking significant changes to their product lines, entailing massive losses for non-compliant products that have already been manufactured and delivered as well as reverberating impacts across their supply chains throughout the country, or (b) completely abandon the market in an entire region of the country, thereby impacting not only Minnesota consumers but customers in surrounding states, as well. *See* Compl. ¶¶ 31-34, 59. Even the choice to exit the Minnesota market would cause cascading burdens throughout manufacturers' interstate supply chains.

The Statute forces Plaintiff's members to pick between three bad alternatives: (1) withdraw from the Minnesota market entirely and lose millions of dollars in revenue and customer goodwill, (2) incur millions of dollars in unnecessary expenses and disrupt a global market to transition their nonstick products entirely to a sol-gel ceramic alternative for all consumers, or (3) incur similar costs to create entirely new production capacity, with the associated supply chains, to produce sol-gel ceramic products exclusively for the Minnesota market. Compl. ¶ 59. This choice — which is imposed only on manufactures outside of Minnesota, as a practical reality — is burdensome in and of itself. Moreover, any option entails its own substantial burdens on interstate commerce.

The Complaint also sets forth how compliance with the Statute's ban on the Subject

Cookware is not a matter of simply throwing a switch from fluoropolymer to "ceramic" on the factory wall.  As discussed above, so-called "ceramic" nonstick produced using a sol-gel method is the only viable alternative to making a nonstick pan without fluoropolymers, which consumers nationwide overwhelmingly prefer to uncoated cookware.  *See* Compl. ¶¶ 26, 35.    And the manufacturing infrastructure that already exists to produce fluoropolymer nonstick cannot easily be adapted to sol-gel ceramic production.  *See* Compl. ¶¶ 31-34.  Indeed, much of CSA's members' production capacity is built around a rolling production method that cannot be adapted to ceramic production at all.  *See* Compl. ¶¶ 31, 34.

Out-of-state commercial actors will suffer certain burdens regardless of whether CSA's members attempt to build sufficient production capacity to satisfy demand in Minnesota with "ceramic" nonstick products or exit the market completely.  First, the Statute's imposition of its prohibition without adequate lead time for manufacturers to adapt has forced CSA's members to bear losses from already-manufactured product that is now prohibited in the State.  Second, in order to avoid transgressing the Statute, CSA's members must take steps to ensure that Subject Cookware are not *unintentionally* distributed in Minnesota.  As a practical matter, CSA's members must effectively extend Minnesota's ban beyond its borders to consumers in the surrounding states in order to ensure that fluoropolymer nonstick products bound for Madison do not end up in Mankato.

These substantial burdens are "clearly excessive" in light of the putative local benefits because, as discussed above, the Complaint adequately alleges that the cookware ban is devoid of local benefits. *See, e.g.*, Compl. ¶¶ 63-76.  Consequently, the *Pike* analysis

for this Court is simple:  A **single** burden on interstate commerce would be clearly excessive when the prohibition on the Subject Cookware conveys *no meaningful benefits*. As discussed at length above, the ban on the FDA-approved Subject Cookware provides no health benefits to Minnesotans because the Subject Cookware pose no health risks to Minnesotans.  Fluoropolymer nonstick cookware is specifically designed to not release fluorochemical PFAS to either food after cooking or the environment after disposal.  *See* Compl. ¶ 71.  Even if such cookware were subjected to such atypical abuse that it did shed incidental fluoropolymers, the Complaint alleges that *those polymers are too large to be absorbed by the body anyway*.  *See* Compl. ¶ 64.

The Statute's ban, at least as applied to the Subject Cookware, is pointless.  The result is a massive upheaval in the out-of-state cookware market causing cascading effects both up the stream of commerce from Plaintiff's members — such as out-of-state producers in their supply chains — and downstream to consumers in the states surrounding Minnesota.  And for all that economic tumult, the Statute's ban of the Subject Cookware fails to deliver a single local benefit to Minnesota citizens.  The Complaint therefore plausibly alleges that the Statute fails the balancing test required by *Pike* and states a claim for violating the Dormant Commerce Clause.

*     *     *

In sum, as applied to the Subject Cookware, the Complaint alleges the Statute is unconstitutional in two independently sufficient ways.  First, it is an impermissibly discriminatory regulation that cannot survive strict scrutiny.  Second, it imposes a substantial and undue burden on interstate commerce outweighing any actual local benefit.

The factual allegations in the Complaint, assumed true, sufficiently support those constitutional claims. Consequently, Defendant's Motion to Dismiss Counts I and II of the Complaint should be denied.

## **CONCLUSION**

For these reasons Plaintiff respectfully requests the Court deny Defendant's Motion to Dismiss.

Dated: March 31, 2025                    Respectfully Submitted,

**COZEN O'CONNOR**

/s/ *Andrew D. Linz*
Andrew D. Linz (PA 324808)
*Admitted pro hac vice*
alinz@cozen.com
Stephen Miller (PA 308590)
*Admitted pro hac vice*
samiller@cozen.com
1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 665-2000 | Telephone
(215) 665-2013 | Facsimile

Cassandra M. Jacobsen (#0400120)
cjacobsen@cozen.com
33 South 6th Street, Suite 3800
Minneapolis, MN 55402
(612) 260-9000 | Telephone
(612) 260-9080 | Facsimile