UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

COOKWARE SUSTAINABILITY ALLIANCE,

Plaintiff,

v.

KATRINA KESSLER, *Commissioner, Minnesota Pollution Control Agency, in her official capacity*,

Defendant.

Civil No. 25-41 (JRT/DTS)

MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

---

Andrew Linz and Stephen Aaron Miller, **COZEN O'CONNOR**, 1650 Market Street, Suite 2800, Philadelphia, PA 19103; Cassandra Jacobsen, **COZEN O'CONNOR**, 33 South Sixth Street, Suite 3800, Minneapolis, MN 55402, for Plaintiff.

Emily Beth Anderson and Oliver J. Larson, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 1400, Saint Paul, MN 55101, for Defendant.

To protect Minnesotans from perceived dangers of per- and poly-fluoroalkyl substances ("PFAS"), the Minnesota legislature passed Amara's Law, which banned the sale of many products, including cookware, if those products contained intentionally added PFAS. An industry group, the Cookware Sustainability Alliance ("CSA"), brought suit against the Commissioner of the Minnesota Pollution Control Agency (the "Commissioner") to enjoin implementation of the law, arguing it violated the dormant Commerce Clause. The Court previously denied CSA's motion for preliminary injunction,

and the Commissioner now moves to dismiss for failure to state a claim. Because the Complaint fails to state a dormant Commerce Clause claim, the Court will grant the Commissioner's Motion to Dismiss and dismiss the dormant Commerce Clause claims with prejudice.

## BACKGROUND

### I.   FACTS

The Court detailed the relevant facts in its prior order denying a preliminary injunction motion. *Cookware Sustainability All. v. Kessler*, No. 25-41, 2025 WL 607324, at *1–2 (D. Minn. Feb. 25, 2025). The Court incorporates those facts by reference and only briefly summarizes the relevant facts below.

In 2023, The Minnesota Legislature passed "Amara's Law," Minnesota Session Law – 2023, Chapter 60, Article 3, Section 21, codified as Minn. Stat. § 116.943 (the "Statute"), which, among many other things, banned the sale or distribution of cookware products containing intentionally added PFAS. (Compl. ¶ 1, Jan. 6, 2025, Docket No. 1.) The Commissioner is authorized by the Statute to enforce and investigate violations. (*Id.* ¶ 16.) If a violation occurs, the Statute authorizes a court to criminally prosecute up to a misdemeanor and impose a civil penalty up to $15,000 per day per violation. (*Id.* ¶ 52.)

CSA is a non-profit business league organization that consists of three leading cookware manufacturers: Meyer Corporation U.S., Groupe SEB, and Tramontina (collectively, "CSA Members"). (Compl. ¶¶ 13–14.) All three are headquartered outside

Minnesota, and all three admittedly manufacture cookware that contains PFAS.[1] (*Id.* ¶¶ 10, 14.) Together, CSA Members supply approximately 47% of the fluoropolymer nonstick products sold in the United States and 57% of the fluoropolymer nonstick products sold in Minnesota. (*Id.* ¶ 38.) Only one cookware manufacturer, Nordic Ware, is located in Minnesota; however, in response to the Statute, Nordic Ware discontinued its line of cookware products that contained PFAS. (*Id.* ¶¶ 40–43.) As a result, 100% of the fluoropolymer nonstick products in the global market are now manufactured outside Minnesota. (*Id.* ¶ 44.) CSA reports that Minnesota retailers began cancelling orders with CSA's Members in advance of the Statute going into effect. (*Id.* ¶ 58.)

## II.     PROCEDURAL HISTORY

CSA commenced this action on January 6, 2025, by filing a complaint seeking declaratory and injunctive relief against Katrina Kessler, in her official capacity as Commissioner of the Minnesota Pollution Control Agency. (*Id.* at 1.) CSA originally alleged that the Statute violates the Commerce Clause, the First Amendment, and the Supremacy Clause. (*Id.* ¶¶ 119, 129, 131, 138–39.) CSA moved for a preliminary injunction on January 7, 2025, claiming ongoing and irreparable harm caused by the

---

[1] The cookware industry categorizes its products into two main groups: Nonstick Products and Other Products. (Compl. ¶ 22.) Three available technologies exist to create the nonstick coating: (1) fluoropolymer nonstick; (2) sol-gel; and (3) silicone-based nonstick. (*Id.* ¶ 24.) The most common fluoropolymer compounds used to create the nonstick feature are polytetrafluoroethylene ("PTFE"), fluorinated ethylene propylene ("FEP"), and perfluoroalkoxy alkane ("PFA"). (*Id.* ¶¶ 28–29.) PTFE, FEP, and PFA all meet the Statute's definition of PFAS. (*Id.* ¶ 55.)

Statute's imminent ban on the sale or distribution of cookware products containing intentionally added PFAS in Minnesota.² (Pl.'s Mem. Supp. Mot. Prelim. Inj. at 8, Docket No. 12.) The Court denied that motion after determining that CSA was highly unlikely to succeed on the merits of its dormant Commerce Clause causes of action. *Cookware Sustainability All.*, 2025 WL 607324, at *5.

The Commissioner then moved to dismiss the entire Complaint. (Mot. Dismiss, Mar. 10, 2025, Docket No. 27.) In its response, CSA agreed to voluntarily dismiss without prejudice its causes of action under the First Amendment (Count 3) and the Supremacy Clause (Count 4). (Def.'s Resp. Opp'n Mot. Dismiss at 12 n.2, Mar. 31, 2025, Docket No. 31.)

## DISCUSSION

**I.     STANDARD OF REVIEW**

In reviewing a motion to dismiss, the Court considers all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court "accept[s] as true all facts pleaded by the non-moving party and grant[s] all reasonable inferences from the pleadings in favor of the non-moving party." *Syverson v. FirePond, Inc.,* 383 F.3d 745, 749 (8th Cir.

---

² The preliminary injunction motion did not ask for relief as to the First Amendment and Supremacy Clause claims.

2004) (quoting *United States v. Any & All Radio Station Transmission Equip.*, 207 F.3d 458, 462 (8th Cir. 2000)).  However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  In other words, a complaint "does not need detailed factual allegations" but must include more "than labels and conclusions, and a formulaic recitation of the elements" to meet the plausibility standard.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The only material difference between the Court's analysis in the preliminary injunction and the motion to dismiss is the applicable standard of review.

## II.     ANALYSIS

Plaintiffs rely on the dormant Commerce Clause to challenge the Statute.  The Commerce Clause grants Congress the power to regulate interstate commerce.  U.S. Const. art. I, § 8, cl. 3.  The Commerce Clause "has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce."  *Or. Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 98 (1994); *see also S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 592 (8th Cir. 2003) ("The dormant Commerce Clause is the negative implication of the Commerce Clause: states may not enact laws that discriminate against or unduly burden interstate commerce.").  At its core, the dormant Commerce Clause caselaw is meant to curtail "state protectionism."  *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 515 (2019); *Entergy Ark., LLC v. Webb*, 122 F.4th 705, 710 (8th Cir. 2024) ("The

dormant Commerce Clause prohibits the enforcement of state laws driven by economic protectionism.").

"A state statute violates the dormant Commerce Clause if it: (1) clearly discriminates against interstate commerce in favor of in-state commerce, (2) imposes a burden on interstate commerce that outweighs any benefits received, or (3) has the practical effect of extraterritorial control on interstate commerce." *Styczinski v. Arnold*, 46 F.4th 907, 912 (8th Cir. 2022) (quotation omitted).

CSA presses only the first two versions of a dormant Commerce Clause claim. The first cause of action is easier: CSA need only show the statute "mandate[s] 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Granholm v. Heald*, 544 U.S. 460, 472 (2005) (quoting *Or. Waste Sys.*, 511 U.S. at 99). In such a case of overt discrimination—either facially or with a discriminatory purpose or intent—the state law must survive strict scrutiny. *Entergy Ark.*, 122 F.4th at 711.

But the second is much more difficult: absent discrimination, CSA must show that the statute imposes a burden on interstate commerce that "is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

CSA succeeds on neither.

A. **Discrimination Against Out-of-State Interests**

First, CSA alleges that the Statute discriminates against out-of-state interests because it only applies to out-of-state manufacturers now that Nordic Ware no longer sells PFAS-laden cookware.

As a threshold matter, CSA concedes that the Statute is facially neutral and was not passed with the intent to discriminate against out-of-state entities. To suggest anything else would fly in the face of the Statute's legislative history. Indeed, that history indicates that legislators chose to protect Minnesotans from the potential dangers of PFAS contamination **despite** its disproportionate effect on in-state industry. Bill sponsor Senator Judy Seeberger noted that PFAS "originated here, and I believe we have a duty to lead the charge in their eradication"; Representative Sydney Jordan concurred, stating, "Minnesota invented PFAS. By passing this, Minnesota is going to invent the solution and end this harm caused by forever chemicals."[3] It would be absurd to argue that a law strictly banning PFAS in a slew of products was passed with the purpose of protecting in-state interests when Minnesota is home to 3M—practically the godfather of modern PFAS litigation.

---

[3] Press Conference: Banning Products Containing PFAS, May 9, 2023, Minnesota Senate Media Services, available at https://www.youtube.com/watch?v=bZKxlVf5AHg at 5:30 & 19:56. Parties debate whether the Court may take judicial notice of such legislative history at the Motion to Dismiss stage. But that argument is inapposite; CSA has conceded the Statute was not passed with the intent to prop up in-state industry. It relies solely on the effect the law has on out-of-state players.

So CSA instead focuses narrowly on one argument: the Statute has the effect of discriminating against interstate commerce in favor of in-state commerce because it only applies to out-of-state manufacturers. But that's wrong. When the Statute was signed into law, at least one manufacturer in Minnesota, Nordic Ware, used PFAS in its cookware. Nordic Ware responded with compliance instead of litigation. But that does not mean the law no longer applies to Nordic Ware—the Statute applies to Nordic Ware as much today as it did the day before the company ceased producing such cookware, because it is prevented from renewing that particular line of cookware. Choosing to comply with a law does not relieve one from the burden of the law. If a city sets a 50mph speed limit, the law applies equally to the motorist who chooses to drive 45mph and the motorist who drives 65mph, even if the consequences for their respective decisions to comply differ.

CSA's critical flaw is that it "confuse[s] a law that has only a disparate impact on out-of-state businesses for one that has discriminatory effects on interstate commerce." *Truesdell v. Friedlander*, 80 F.4th 762, 771 (6th Cir. 2023). It is true that (now that Nordic Ware has removed PFAS products from its inventory) the law effectively only bans products manufactured outside Minnesota. But that is an effect on particular out-of-state businesses, not a structural effect on interstate commerce. Indeed, even if there had never been any in-state manufacturers located within Minnesota, a state may still prohibit the sale of products manufactured 100% outside the state, so long as the purpose is not to give a competitive advantage to an in-state entity. *See Exxon Corp. v. Governor*

*of Md.*, 437 U.S. 117, 125–26 (1978) (upholding a gas regulation that had a 100% disparate impact on out-of-state producers because it simply preferred one type of gas over another).

A thought experiment helps illustrate this point: say, for example, a CSA Member decided to move its operations to Minnesota. Would the burden on that member be less than it was the day before it moved? No. Because the Statute changes nothing in the structure of the market to benefit in-state firms. That is in contrast to, for example, a case heard by the Sixth Circuit, *Foresight Coal Sales, LLC. v. Chandler*, 60 F.4th 288 (6th Cir. 2023). There, Kentucky had imposed a severance tax on coal extracted within its borders. *Foresight Coal Sales*, 60 F.4th at 293. But Kentucky also required its Public Service Commission ("PSC") to purchase the cheapest coal on the market. *Id.* That created a problem, as most other states did not have a severance tax, and so the PSC would often buy coal from out of state. *Id.* To fix the problem, Kentucky required the PSC, in making those calculations, to subtract the cost of any severance taxes, thereby making it more likely the PSC would buy Kentucky coal. *Id.* at 293–94. The Sixth Circuit rightly found this to be a structural burden on interstate commerce. There was technically no facial discrimination against out-of-state producers in the law, but the law had the structural effect of favoring in-state producers solely because they were in-state.

Here, the law applies equally to every cookware manufacturer, regardless of geography. That the burden now falls only on manufacturers that currently are

headquartered elsewhere is inconsequential. By passing the Statute, the Minnesota Legislature did not give any structural "competitive advantage" to in-state industry. *Exxon Corp.*, 437 U.S. at 126. Nordic Ware must make the same sacrifices any other company must to manufacture cookware that is free of PFAS to sell to Minnesota consumers. That burden would not become heavier if Nordic Ware uprooted and moved to Wisconsin. And no competitor would benefit from moving into Minnesota.

Because the Statute does not discriminate—facially, in purpose, or in effect—against out-of-state interests, Count 1 fails to state a dormant Commerce Clause claim.

### B.     Undue Burden on Interstate Commerce

Absent discrimination, a state generally retains the power to "exclude from its territory, or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to the interests of its citizens." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (quotation omitted). However, a state law still violates the dormant Commerce Clause if the plaintiff proves that the law substantially burdens interstate commerce, and those burdens clearly outweigh its benefits. *See id.* at 383–84; *Entergy Ark.*, 122 F.4th at 711. The Court must conduct a *Pike* balancing analysis under this version of a dormant Commerce Clause claim: "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.

CSA's primary argument is that Minnesota is single-handedly regulating the entire cookware industry by banning PFAS in cookware manufacturing. The "substantial burden" is, allegedly, that industry must either comply with the law by significantly changing their product lines or else exit the Minnesota market altogether.

The Court roundly rejected the merits of CSA's dormant Commerce Clause claim in its order denying a preliminary injunction. But the standard of review has shifted here, such that now the central fight in this particular motion is how to treat CSA's allegations about the dangers of PFAS in cookware. In its Complaint, CSA alleges its nonstick products "present no appreciable risk of exposing Minnesotans to small-molecule PFAS, either directly through their use as cookware or indirectly through environmental contamination." (Compl. ¶ 72.) The Commissioner disagrees. She includes in briefing many references to an internally created report that documents the severe effect of PFAS-laden cookware to both Minnesotans' health and the environment that she says contradicts CSA's allegations. However, in a motion to dismiss, the Court must accept the Complaint's allegations as true. Therefore, the Court must accept the claims that PFAS in cookware has no real effect on Minnesotans' health.

But that deference does not rescue CSA's claim for a few reasons.

First and most importantly, the Court need not even proceed to the *Pike* balancing test if the plaintiff fails to plausibly allege a substantial burden on interstate commerce. *Pork Producers*, 598 U.S. at 383–85. Such is the case here. It is true that CSA Members

who refuse to comply with the Statute may well have to exit the Minnesota market. But the Commerce Clause does not guarantee any "particular structure or methods of operation in a retail market." *Exxon Corp.*, 437 U.S. at 127. Nowhere in the Complaint does CSA allege a burden on interstate commerce itself; instead, it focuses exclusively on the burden to out-of-compliance market participants, alleging that the Statute

> effectively forces CSA's members to choose between three bad alternatives: (1) withdraw from the Minnesota market entirely and lose millions of dollars in revenue and customer goodwill, (2) incur millions of dollars in unnecessary expenses and disrupt a global market to transition their nonstick products entirely to a sol-gel ceramic alternative for all consumers, or (3) incur similar costs to create entirely new production capacity, with the associated supply chains, to produce sol-gel ceramic products exclusively for the Minnesota market.

(Compl. ¶ 59.)

But *Pork Producers* has already foreclosed those arguments. In *Pork Producers*, California passed a law preventing the sale in California of pigs that were "confined in a cruel manner." 598 U.S. at 365–66. Industry groups were similarly apoplectic. They argued that complying would force them to invest heavily in new facilities and pass those costs onto consumers, or else exit the California market altogether. *Id.* at 366–67. But that effect on individual businesses "did not impose a sufficient burden on interstate commerce to warrant further scrutiny" under the *Pike* balancing test. *Id.* at 384. That was so regardless of whether the market was made up of exclusively out-of-state participants or a mix of in-state and out-of-state participants—because the burden was

-12-

on firms to change their practices, not interstate commerce itself. *Id.* at 384–86. That failure to demonstrate a substantial burden on interstate commerce is enough on its own to doom CSA's claim, without ever needing to assess the veracity of CSA's allegations about the dangers of PFAS.

Second, even if the Court did reach the full balancing test under *Pike*, the Court may (and indeed must) still consider the putative local benefits to the state. *Pike*, 397 U.S. at 142. In other words, the Court must also take the legislature at its word that it is acting on behalf of legitimate state interests. If it did anything else, the Court would be stepping in the policymaking shoes of the legislature, and the Commerce Clause does not "authoriz[e] judges to strike down duly enacted state laws regulating the in-state sale of ordinary consumer goods . . . based on nothing more than their own assessment of the relevant law's 'costs' and 'benefits.'" *Pork Producers*, 598 U.S. at 380.

Third, on the other side of the balancing test, *Pork Producers* also makes clear that any "costs ultimately borne by in-state consumers thanks to a law they adopted" is not a cognizable harm and should not count against the state in the *Pike* balancing test. *Pork Producers*, 598 U.S. at 386. Here, though CSA recharacterizes the burden as one on the manufacturers, the largest burden is likely to be faced by Minnesota consumers themselves, as they will no longer have access to nonstick cookware that contains PFAS. But Minnesotans elected legislators who chose to sacrifice those options for the overall health of the state. That was their choice to make.

Finally, *Pork Producers* clarified that the two traditional paths to proving a dormant Commerce Clause claim—overt discrimination and undue burden on interstate commerce—represent more of a spectrum than a dichotomy. So, if plaintiffs cannot prove a law is discriminatory, they do not begin their undue burden claim with an "auspicious start," and their burden becomes much heavier under the *Pike* balancing test. *Id.* at 379–80. As the Court has noted, CSA fails to state a claim of overt discrimination under the dormant Commerce Clause, so the undue burden on interstate commerce must be stronger still. CSA fails to clear that high hurdle.

Overall, it simply does not matter that CSA claims PFAS in cookware poses no danger to Minnesotans. Accepting that claim as true, CSA still has not adequately shown a substantial burden on interstate commerce. And even if it had, that burden does not clearly outweigh the putative benefits the Statute provides to the state.

## CONCLUSION

In its preliminary injunction order, the Court found that CSA was highly unlikely to succeed on its dormant Commerce Clause claims. The standard of review for a motion to dismiss is different, but even accepting as true CSA's minimization of the effects of PFAS on Minnesotans, CSA has not stated a valid dormant Commerce Clause claim because it has not alleged a substantial burden on interstate commerce. Accordingly, the Court will grant the Motion to Dismiss, dismissing the dormant Commerce Clause claims in the Complaint with prejudice and the voluntarily dismissed claims without prejudice.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that

1. Defendant's Motion to Dismiss [Docket No. 27] is **GRANTED**.

2. The Complaint [Docket No. 1] is **DISMISSED** as follows:

    a. The dormant Commerce Clause claims [Counts 1, 2] are **DISMISSED WITH PREJUDICE**.

    b. The First Amendment [Count 3] and Supremacy Clause [Count 4] claims are **DISMISSED WITHOUT PREJUDICE**.

    **LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: August 11, 2025
at Minneapolis, Minnesota.

                                            JOHN R. TUNHEIM
                                      United States District Judge